Booth SMITH, Plaintiff,

v.

Gary D. TOLLEY, Defendant.

Civil Action No. 3:95CV979.

United States District Court,
E.D. Virginia,
Richmond Division.

April 4, 1997.

980

---

Booth Smith, Chester, VA, pro se.

John H. OBrion, Derrick Thomas, Cowan & Owen, P.C., Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action, brought pursuant to 42 U.S.C. § 1983, Booth Smith asserts several claims against Gary D. Tolley, a Chesterfield County Police Officer.[1] Smith alleges that Tolley:

---

**1.** On December 12, 1995, Booth Smith and his wife, Linda Smith, filed a complaint against several Virginia law enforcement officers and members of the judiciary, claiming a violation of several constitutional rights, actionable under various statutes, including 42 U.S.C. § 1983. By Order dated September 24, 1996, summary judgment was granted in favor of all defendants except Gary D. Tolley. That Order also denied Tolley's motion to dismiss but permitted him to file further dispositive motions. Tolley thereafter filed the motion for summary judgment which is the subject of this Memorandum Opinion.

Linda Smith is a named plaintiff, but the Complaint, as amended, actually asserts no claims on her behalf against Tolley.

(1) deprived Smith of the right to retreat into his home, as secured by the Fourth and Fourteenth Amendments to the United States Constitution;

(2) deprived Smith of the right to privacy and to be secure in his house, as protected by the Fourth and Fourteenth Amendments to the United States Constitution, when Tolley forced entry into Smith's home;

(3) deprived Smith of the right to liberty and to be secure in his person under the Fourth and Fourteenth Amendments to the United States Constitution when Tolley seized and bound him;

(4) deprived Smith of the right to due process when Tolley placed him in captivity without a valid or invalid Fourth Amendment arrest warrant issued upon probable cause or upon observation of a crime;

(5) conspired to deprive Smith of constitutionally secured rights and privileges in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution;[2]

(6) falsely arrested and imprisoned Smith; and

(7) caused Smith mental suffering.

In vindication of these seven claims, Smith seeks damages and a declaratory judgment about whether police officers, "defacto and dejure," are subject to the Fourth Amendment. If the answer to the latter question is no, Smith seeks a declaratory judgment regarding whether the reason that police officers are not required to have valid arrest warrants is because they are a private police force, operating under military policies.[3]

Tolley's motion for summary judgment contends that he: (i) lawfully entered the Smiths' property to serve Linda Smith with a warrant for her arrest; (ii) lawfully entered the Smiths' home to serve the warrant because he also had reason to believe that Linda Smith resided therein and had reason to believe she was home at that time; and (iii) reasonably believed that Smith committed misdemeanor offenses (obstruction of justice or refusal to assist a police officer) in his presence, and therefore, could arrest Smith without a warrant.[4] In the alternative, Tolley claims that he is entitled to qualified immunity from liability.

## STATEMENT OF FACTS

This action arises out of the attempt by Tolley to serve Booth Smith's wife, Linda, with an arrest warrant at her residence. The warrant charged Linda Smith with failure to attend General District Court in Petersburg after having been properly let to bail and/or recognized to do so in violation of Virginia Code § 19.2–123.[5] According to Smith, Tolley was approximately the tenth police officer to attempt to serve the warrant. (Video Transcript at 13–14, oral argument; Original Complaint at ¶ 53).

On January 10, 1994, Sergeant M.A. Fromal of the Chesterfield County Police Department, directed Tolley to serve an arrest warrant on Linda Smith at her residence, 2720 Executive Drive, Chester, Virginia. (Tolley Aff. ¶ 5). It is undisputed that Booth and Linda Smith resided together at that address. Later that afternoon, Tolley at-

---

**2.** Smith originally alleged that a conspiracy existed between Officer Tolley and Officer Barker, two Chesterfield County Police Officers who attempted to serve an arrest warrant on Linda Smith. For the reasons stated on the record on September 20, 1996, this conspiracy count was dismissed against Barker because: (i) 18 U.S.C. § 241 is a criminal statute, providing no civil remedy; (ii) 42 U.S.C. § 1985(3) requires some racial or otherwise class based invidious discriminatory animus, which Smith failed to allege; and (iii) Smith failed to show any evidence of a conspiracy. For the same reasons, the conspiracy count (Count V) against Tolley is dismissed with prejudice.

**3.** This requested declaration is utterly frivolous. And it is entirely irrelevant to the facts of this action. Hence, the Court summarily rejects it. 28 U.S.C. § 1915(d).

**4.** All references to Booth Smith will be to "Smith." His wife will be referred to as "Linda Smith."

**5.** The underlying summons upon which Linda Smith failed to appear charged that the Smiths had violated the Virginia Statewide Building Code for failing to secure vacant structures. Booth Smith also failed to appear but his arrest warrant had previously been effectuated.

tempted to carry out Fromal's directive and drove to the Smiths' residence. However, upon his arrival, Tolley saw that no cars were parked near the home and no lights were on inside the house. Nor was Tolley able to observe movement of people inside the house. (Tolley Aff. ¶ 6). Based upon these facts, and because it was a weekday afternoon, Tolley concluded that Linda Smith was not at home and was perhaps at work. (Tolley Aff. ¶ 6). Consequently, Tolley did not stop to deliver the warrant. *Id.*

That evening, Tolley and Owen C. Barker, also a Chesterfield County police officer, once again attempted to serve the arrest warrant on Linda Smith. (Smith Complaint ¶ 14, 15) (Tolley Aff. ¶ 7) (Barker Aff. ¶ 4) (Pittman Aff. ¶ 6, Patterson Aff. ¶ 3(a)). The officers arrived at the Smiths' residence at approximately 10:30 p.m. They chose that hour because, in their experience, there was a better chance of successfully serving an arrest warrant on a weekday in the late evening for the reason that residents are likely to be at home at that time. (Tolley Aff. ¶ 8) (Barker Aff. ¶ 5). The officers arrived at the Smiths' residence in a clearly marked police car, and they were dressed in their police uniforms and wore badges. (Plaintiff's Admission No. 1, No. 4). Upon reaching the residence, they observed that the first floor of the Smiths' two-story home was illuminated by interior lights; that a car was parked in the street immediately in front of the home; and that another car was parked in the Smiths' driveway. (Tolley Aff. ¶¶ 11, 13). (Barker Aff. ¶¶ 8, 10). Tolley also saw three individuals inside. (Tolley Aff. ¶ 13). In perspective of their previous experience, Tolley and Barker believed that Linda Smith would be in her place of residence so they parked and approached the house from the front.

Upon sighting the marked police car, as it parked in front of the house, Smith asked his friend to videotape the events, turned on all exterior lights, left the house and confronted the officers outside to inform them that they were crossing "no trespassing" signs. (Second Amd. Compl. ¶ 15, ¶ 16) (Smith Aff. 8). Tolley told Smith that he had a warrant for Linda Smith's arrest and asked if Linda Smith was in the home. (Tolley Aff. ¶ 16) (Barker Aff. ¶ 12). Smith did not respond.[6]

Smith also alleges that the officers failed to identify themselves and a lawful purpose for their presence. (Second Amd. Compl. ¶ 18). Smith did not, however, rebut Tolley's sworn affidavit that, in fact, he had informed Smith that he had a warrant for Linda Smith's arrest.[7] Moreover, considering that Smith has stated that at least ten previous efforts had been made to serve the warrant, it appears that: (1) Smith knew that the warrant was outstanding and (2) these officers were there in yet another effort to serve it. As to identification, Smith acknowledges that the officers wore police uniforms and badges and that he observed the clearly marked police car from which they emerged before approaching the house. (Second Amd. Compl. at ¶ 12, ¶ 13, ¶ 15).

Having refused to respond to Tolley's inquiry, Smith began moving back toward his house. Tolley and Barker followed Smith. (Tolley Aff. ¶ 17, Barker Aff. ¶ 13). Once they reached the front porch, Tolley again informed Smith that he had a warrant for Linda Smith's arrest and again asked if Linda Smith was at home. Once again, Smith refused to answer. (Tolley Aff. ¶ 19) (Barker Aff. ¶ 15). While Tolley, Barker and Smith were on the porch, a male individual inside the Smiths' residence began recording the events with a video camera. (Tolley Aff. ¶ 20) (Barker Aff. ¶ 16) (Video).[8]

**6.** Smith alleges that the officers approached him in a threatening manner, which caused him to fear for his safety. (Second Amd. Compl. ¶ 17) (Smith Aff. ¶ 15). Even if this is true, such facts are irrelevant to Smith's claims.

**7.** Indeed, a careful reading of the Complaint alleges only that the officers did not have a "valid arrest warrant for *Mr. Smith,* did not identify themselves and a lawful purpose to be coming at and after *Mr. Smith.*" (Second Amd.

Compl. ¶ 18). Therefore, the Complaint did not specifically contradict the officers' sworn statements.

**8.** The videotape has been accepted by both sides as an authentic and accurate depiction of events. It confirms that the recording of the officers began before they entered the Smiths' residence.

Smith then moved inside the open front door of his home and attempted to close the door in Tolley's face while Tolley was trying to ascertain the presence of Linda Smith (Tolley Aff. ¶ 21) (Barker Aff. ¶ 17) (Video). Tolley prevented the door from closing, pushed the door open and stepped inside. (Tolley Aff. ¶ 22) (Barker Aff. ¶ 18) (Video). All the while, Smith berated Tolley for violating the Constitution. Once inside, Tolley arrested Smith for obstruction of justice and handcuffed him. Smith looked directly at the camera and asked "Did you get that [on film]"? [9]

Tolley, in a calm and respectful manner, repeatedly informed Smith that he had a warrant for Linda Smith's arrest, showed Smith the warrant and asked whether Linda Smith was at home. (Video). Time and again, Smith evaded Tolley's questions by misquoting legal principles respecting arrest and search and seizure and by asserting that Tolley had violated the Fourth Amendment by entering his home. (Video). After Smith had moderated his conduct, Tolley removed the handcuffs from Smith. Apparently, Tolley also had determined that placing Smith under arrest was erroneous under county policy. (Patterson Aff. at ¶ 3i). Smith, therefore, was under restraint or arrest for a very brief span of time. At the time of his release, Smith became even more confrontational, raising his voice, denouncing Tolley as a criminal and shaking a finger in Tolley's face. (Video).

Tolley and Smith then debated the legitimacy of the warrant, and the authority which it conferred. Tolley remained calm, although Smith acted boisterous and agitated. Shortly thereafter, a friend of the Smiths entered the Smiths' home through the front door and began questioning Tolley's presence as well as the validity of the warrant. He also asked Tolley to leave the premises. The friend acted rudely, arrogantly and belligerently. Smith joined-in with his friend, and the two continued to harass Tolley.

Thereupon, Tolley's requested back-up arrived. And, without serving the warrant, Tolley and Barker left with the newly arrived officer. Throughout the entire encounter, Smith attempted to provoke Tolley, baiting him as if Smith wished that Tolley would violate the Constitution, so as to catch the encounter on video. Even in these most trying of circumstances, Tolley remained calm and composed, respectfully informing Smith that he simply wished to do his job and serve the warrant on Linda Smith. (Video).

## DISCUSSION

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In so doing, the court must view the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion:" and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,·together with affidavits, if any,'" that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); see also *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1338–39 (4th Cir. 1992). Once this initial showing under Rule 56(c) is made, the burden of production, but not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions,

---

**9.** Smith claims that he retreated into his home because he feared for his safety. He also alleges that when he tried to close the door, Tolley grabbed the knob, brutally smashed his shoulder into the door and forced the door open and into Smith's body. Barker, Smith alleges, stood by and watched. The Video refutes Smith's spin on the circumstances of Tolley's entry.

answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)); *see also Catawba Indian Tribe,* 978 F.2d 1334, 1339.

In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Rather, that party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. There is no genuine issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356; *see also Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. Pursuant to these well established principles, and for the following reasons, Tolley's motion for summary judgment on Smith's federal constitutional claims is granted.

### A. Unlawful Search of the Smith Home

Smith alleges that Tolley's forced entry into his home violated the Fourth and Fourteenth Amendments. (Counts I and II, Second Amended Compl. ¶¶ 19–22; 27–29).

■ The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." Const. Amd.IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). Indeed, the " 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment

is directed.' " *Id.* at 585, 100 S.Ct. at 1379 (quoting *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972)).

■ As the Supreme Court has explained: " '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'... In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 589, 100 S.Ct. at 1381 (quoting in part, *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 682–83, 5 L.Ed.2d 734 (1961)). These established principles must be taken in context with the equally settled proposition that, "for Fourth Amendment purposes an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives *when there is reason to believe the suspect is within.*" *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388. (emphasis added).

■ In this action, Tolley entered the Smiths' residence to serve an arrest warrant on Linda Smith, who, indisputedly resided therein. Tolley did not possess a *search* warrant and no facts indicate exigent circumstances. Consequently, under *Payton,* Tolley could lawfully enter the Smiths' house without consent only if the following three elements were met: (1) Tolley possessed a valid arrest warrant; (2) the warrant was to be served on a suspect whom Tolley had reason to believe resided in the Smiths' house; and (3) Tolley had reason to believe that the suspect was present at the time of attempted service.[10] As explained below, these three factors were met here.

---

**10.** Although *Payton* required only that an officer possess an arrest warrant and reason to believe that the suspect is *present,* the second element is required because, in *Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), the Supreme Court held that absent exigent circumstances or consent, a law enforcement officer must obtain a *search warrant* to search for the subject of an arrest warrant in the home of a *third party.* Moreover, in *United*

States v. Magluta, 44 F.3d 1530 (11th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995), the Eleventh Circuit held that a law enforcement agent must possess *both* a *"reasonable belief* that *the location ... is the suspect's dwelling, and* that the suspect is within the residence ..."* Id.* at 1535. (emphasis added). *See also United States v. Lauter,* 57 F.3d 212 (2nd Cir.1995) (holding that police officers must have a reasonable belief that the suspect resides where

### 1. The *Payton* "Reason to Believe" Standard Has Been Satisfied

Determining that the first and second elements of the *Payton* test have been satisfied requires only a brief discussion. As to the first element, this Court previously ruled, at a hearing on related issues in this action, that the warrant Tolley intended to serve on Linda Smith was valid.[11] As to the second element, it has not been contested that Linda Smith resided at 2720 Executive Drive, the address where Tolley attempted to effectuate the warrant. (*See* First Amended Complaint). Moreover, Tolley had "reason to believe" this fact[12] because the warrant he was executing so stated, and because, when Sergeant Fromal handed Tolley the warrant, Fromal verbally instructed Tolley that Linda Smith, in fact, lived at the listed residence. (Patterson Aff. ¶ 3(a)) (Tolley Aff. ¶ 5).

Thus, whether Tolley had reason to believe that Linda Smith was present at the time he attempted to serve the warrant is the focus of Smith's Fourth Amendment claims. For the reasons set forth below, Tolley has also satisfied this third element.

### a. The "Reason to Believe" Standard.

The Supreme Court did not define the "reason to believe" standard which it articulated in *Payton,* and the circuits have not provided much guidance.[13] *See United States v. Magluta,* 44 F.3d 1530, 1534 (11th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995) (noting the dearth of discussion on this issue). Hence, it remains unsettled whether "reason to believe" is synonymous with "probable cause" or whether the Supreme Court intended for the "reason to believe" standard to involve a lesser degree of certainty than is required to establish probable cause.

Notwithstanding the uncertainty, some direction may be found in the decisions of several courts of appeals which have examined how law enforcement officers may satisfy the *Payton* "reason to believe" standard. For instance, in *Magluta,* 44 F.3d 1530, the Eleventh Circuit stated:

> We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a *reasonable belief* that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.

> \*　　\*　　\*　　\*　　\*　　\*

> In evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to *common sense factors indicating a resident's presence.* For example, officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home, and officers may presume that a person is at home at certain times of the day—a presumption which can be rebutted by contrary evidence regarding the suspect's known schedule.

*Magluta,* 44 F.3d at 1535 (emphasis added); *compare United States v. May,* 68 F.3d 515, 516 (D.C.Cir.1995) (police *"reasonably could suppose"* that suspect lived at address on affidavit and would still be inside when they arrived); *United States v. Risse,* 83 F.3d 212, 216 (8th Cir.1996) (officers "need only 'reasonably believe' that the suspect resides at the dwelling to be searched and is currently present at the dwelling").

arrest warrant is to be served and reason to believe that suspect is present).

**11.** This decision was rendered at a hearing held on September 20, 1996, at which time, the Court dismissed the majority of the Smiths' claims. *See supra* note 2.

**12.** This is true no matter what the standard for "reason to believe" is, as further addressed, *infra.*

**13.** In *Payton,* the parties did not argue that the officers involved in the action lacked probable cause to believe that the suspect was at home when they entered. *Payton,* 445 U.S. at 582, 100 S.Ct. at 1377–78. Thus, the facts of *Payton* provide little counsel toward decision of the present action.

The Second Circuit also has examined the quantum of facts an officer must articulate in order to prove adequate "reason to believe." In *United States v. Lauter*, 57 F.3d 212 (2nd Cir.1995), the Court of Appeals explicated that "[a]gents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a *reasonable belief* exists that a suspect is present." *Id.* at 215 (emphasis added) (citing *United States v. Terry*, 702 F.2d 299, 319 (2nd Cir.), *cert. denied*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983) (relying on factors "indicating that there was a 'reasonable basis' for believing that defendant resided in and was present at the apartment.")). Therefore, based on this rule, the Second circuit concluded that the district court in *Lauter* had "applied too stringent a test when it held that 'officers may properly determine whether they have *probable cause* to believe that an apartment or house is the arrestee's residence, and . . . whether they may enter to effect the arrest when they have a reasonable basis to believe that the arrestee will be present.'" *Id.* at 215 (emphasis added). Rather, "the proper inquiry is whether there is a *reasonable belief* that the suspect resides at the place to be entered to execute an arrest warrant, and whether the officers have reason to believe that the suspect is present." *Id.* (emphasis added) (citing *Magluta*, 44 F.3d at 1533, 1535; *United States v. Manley*, 632 F.2d 978, 983 (2d Cir.1980) ("the reasonable belief standard . . . may require less justification then the more familiar probable cause test"), *cert denied*, 449 U.S. 1112, 101 S.Ct. 922, 66 L.Ed.2d 841 (1981)). In sum, based on *Lauter*, the *Payton* "reason to believe" standard is synonymous, in the Second Circuit, with "reasonable belief," a standard which requires a lesser showing than that required to find "probable cause." [14]

Wayne R. LaFave, the respected authority on search and seizure, has expressed the view that, in defining the scope of *Payton*, "on balance it seems preferable to insist upon probable cause." W.R. LaFave, 3 *Search and Seizure, A Treatise on the Fourth Amendment*, 3d Edition 228 (1996). LaFave advocates, however, that the probable cause test in this area of the law may be a more relaxed standard than is customary. To that end, LaFave recommends that courts should use "common sense" in applying the probable cause requirement, permitting reasonable inferences to be drawn from the circumstances. *Id.* at 228–29.

The Fourth Circuit has not taken a position on the quantum of proof necessary to establish "reason to believe" under *Payton*. However, an unpublished decision, *United States v. Morgan*, 972 F.2d 343, 1992 WL 203950 (4th Cir.1992) (unpublished opinion),[15] provides a helpful analysis of the issue. In *Morgan*, the Fourth Circuit found that police officers, who were attempting to serve an arrest warrant, had established that they possessed sufficient "reason to believe" that a suspect was home when they observed that the residence's interior lights were on and also observed the suspect's car parked behind the residence. Moreover, one officer saw a person (believed to be the suspect) run across the yard toward the suspect's house, and by the time the officers reached the house, the lights had been turned off. The Fourth Circuit further explained that it was unnecessary to determine whether the suspect was in fact in his home. To the contrary, the pertinent question was whether the officers had "reason to believe" that the suspect was there.

The theory that *Payton* requires probable cause to believe that the suspect is at home cannot be squared with the language which the Supreme Court used in deciding *Payton*. There, the Supreme Court first noted that the authority to enter the suspect's residence to serve an arrest warrant was implicitly to be found in "an arrest warrant founded on

---

**14.** The Court of Appeals in *Lauter* ultimately concluded that the officers had *reason to believe* that the suspect resided and was present when the warrant was to be served because a reliable informant had told the police that the suspect had just moved to the apartment and that the suspect was unemployed and slept late, thus supporting a *"reasonable belief* that [the suspect] was [there] when the warrant was executed." *Lauter*, 57 F.3d at 215 (emphasis added).

**15.** In this Circuit, unpublished opinions are not binding. Nonetheless, they are helpful analytical tools.

probable cause." The Court then conditioned the exercise of that authority (*e.g.,* entry without a search *warrant*), not upon probable cause "to believe the suspect is within," but upon the existence of "reason to believe the suspect is within." *Payton v. New York,* 445 U.S. at 603, 100 S.Ct. at 1388. Having used the term "probable cause" in the first part of the sentence which ends with the language "reason to believe the suspect is within," it cannot reasonably be thought that the Supreme Court intended to impose a probable cause standard by using the "reason to believe" language. The illogic of this conclusion is demonstrated by the plain language used by the Court and by the truism that, when the Court wishes to use the term "probable cause," it knows how to do so. Thus, "reason to believe the suspect is within" cannot be translated to mean probable cause to believe the suspect is within.[16] *See Magluta,* 44 F.3d at 1534 (noting that text of *Payton* lends strongest support for view that lesser burden than probable cause is required because it must be assumed that verbal formulation was conscious choice) (citing LaFave, *supra.* § 6.1(a) (1987), speculating

that language in *Payton* may have been chosen to discourage courts from requiring "hard nosed probable cause" but arguing for probable cause test "on balance").

Nor is it sound, or even useful, to say that the test is one of probable cause, but that the probable cause standard is, in this limited instance, more relaxed than that usually called to mind by that term. Indeed, to suggest the use of a relaxed probable cause standard, one which does not require "special knowledge" and is animated by common sense, is to actually acknowledge that the standard, in reality, is not one of probable cause at all.

■ Considering, as the touchstone, the "reason to believe" language of *Payton* in perspective of *Payton*'s requirement of an arrest warrant supported by probable cause, and taking into account the singular sanctity enjoyed by the home in Fourth Amendment jurisprudence, it is preferable to require, as did the Eleventh Circuit, in *Magluta,* and the Second Circuit, in *Lauter,* that the serving officer have a *reasonable belief*[17] that the suspect is within his or her residence before

**16.** This conclusion is not contradicted by Justice White and the other dissenting Justices in *Payton,* who explicated that: "At common law, absent exigent circumstances, entries [of a home] to arrest could be made only for felony ... And in my view, the officer entering to arrest must have *reasonable grounds to believe,* not only that the arrestee has committed a crime, but also that the person suspected is present in the house at the time of the entry." *Payton,* 445 U.S. at 616, 100 S.Ct. at 1395 (White, Jr., dissenting) (emphasis added). Although this language seems to equate the quantum of proof necessary to make an arrest with that necessary to believe a suspect is at home, in a footnote, the dissenting Justices further explained, "I do not necessarily disagree with the Court's discussion of the quantum of *probable cause* necessary to make a valid home arrest. The Court indicates that only an arrest warrant, and not a search warrant is required ... To obtain the warrant, therefore, the officers need only show *probable cause* that a crime has been committed and that the suspect committed it. However, under today's decision, the officers apparently need an *extra increment of probable cause* when executing the arrest warrant, namely, *grounds to believe* that the suspect is within the dwelling." *Id.* at n. 13 (emphasis added). Thus, whether the dissenting justices construed the *Payton* decision as requiring probable cause is ambiguous, depending upon what an "increment of probable cause" means.

**17.** In *Magluta,* the Eleventh Circuit recognized that its jurisprudence prior to *Payton* had permitted entry into a residence to execute an arrest warrant upon "reasonable belief." Indeed, the Eleventh Circuit explicated that, pursuant to its precedent, " '[t]he test is properly framed in terms of reasonable belief. Probable cause is essentially a concept of reasonableness, but it has become a term of art in that it must always be determined by a magistrate unless exigent circumstances excuse a warrant ... *Reasonable belief embodies the same standards of reasonableness but allows the officer. who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the Magistrate.*'" *Magluta,* 44 F.3d at 1534–35 (quoting *United States v. Woods,* 560 F.2d 660, 665 (5th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978)) (emphasis added). Therefore, in *Magluta,* the Court of Appeals determined that, in consideration of the fact that probable cause "itself is a doctrine of reasonable probability", and "[d]ue to the lack of authority on the point, it is difficult to define ... reason to believe ... or to compare the quantum of proof the standard requires with the proof that probable cause requires." Hence, according to *Magluta,* it suffices to find that the totality of the facts and circumstances warrant a 'reasonable belief.'

entering to execute an arrest warrant. *See also Risse*, 83 F.3d at 216. This reasonable belief, of course, must be based on common sense factors informed by the experience of police officers and the circumstances encountered in association with efforts, current and past, to serve the warrant at issue. And, the reasonableness of the belief must be tested against an objective measurement of the totality of facts known, or reasonably knowable, to the officers when entry to execute the warrant occurs.

This approach assures that there is probable cause to support the warrant to be served which, in turn, diminishes the scope of the freedom from intrusion of the home to the extent necessary to serve the warrant. At the same time, this approach imposes on the serving officers the obligation to assess the situation at the site of purported service to determine if there are objectively supported reasons to warrant the limited intrusion contemplated by *Payton*—entry to execute a proper warrant on the person therein named only if there is reason to believe that person is within his or her residence. It is against this standard which Tolley's entry must be measured.

**b. Tolley Had Reason to Believe that Linda Smith Was Present at the Time He Attempted to Serve the Warrant.**

▮▮▮ The Court finds that Tolley possessed "reason to believe" that Linda Smith was home at the time he attempted to serve the arrest warrant on her.[18] This analysis, of course, begins with the information Tolley learned on his first attempt to serve the warrant during the afternoon of January 10, 1994. At that time, he observed no cars near

the house, no movement in the house and no lights on. This, quite logically, indicated that no one was home so he left to try later when most people would be at home. When Tolley returned to Linda Smith's residence, it was 10:30 p.m. on a Monday night, a time of day on a day of the week when most people are presumed to be at home. *See Magluta*, 44 F.3d at 1535 ("... courts must be sensitive to common sense factors indicating a resident's presence. For example ... officers may presume that a person is at home at certain times of the day ..."); *Lauter*, 57 F.3d at 214–15 (officer had reason to believe that suspect was present at dwelling because warrant was served at 8:30 a.m., and the officer knew that the suspect was unemployed and typically slept late); *Woods*, 560 F.2d at 665 (finding it "reasonable anticipation on the officers' part to believe that a person would be at his place of abode, especially at 8:30 in the morning for a man not known to be working ...") The presumption that someone is at home at certain times of the day may be rebutted by showing that the police had knowledge of the habits and customs of the suspect. *Magluta*, 44 F.3d at 1535. But, here, no evidence indicates that Tolley knew any of Linda Smith's habits which would rebut the presumption that, like most people, Linda Smith could be expected to be at home at 10:30 p.m. on a week-day.

Moreover, when Tolley arrived at the Smiths' residence on the evening of January 10, he saw two cars parked near the Smiths' home, one in the driveway and one in the street. Interior lights illuminated the house, suggesting that someone was there. The lights further permitted Tolley to observe that three individuals were inside. *See Magluta*, 44 F.3d at 1538 (noting that officers

---

**18.** This holds true no matter how the "reason to believe" standard is construed. Even under the rationale espoused by LaFave, Tolley need not show "special knowledge" that Linda Smith was at home because no facts indicated that she was not at home. According to LaFave:

> rudimentary police procedure dictates that a suspect's residence be eliminated as a possible hiding place before a search is conducted elsewhere.

> \* \* \* \* \* \*

> [I]n the absence of ... unique facts, the police need not possess 'special knowledge' that the

defendant is at home in order to meet the probable cause test, for in the absence of facts tending to show that the defendant is not at home it is reasonable to infer that he would be there.

LaFave, *supra*, at 229 (internal quotations omitted).

saw cars parked outside and porch light on); *Morgan,* 972 F.2d 343, 1992 WL 203950 (4th Cir.1992) (officer observed defendant's car parked in the rear). These facts weigh strongly in favor of a finding that Tolley possessed reason to believe that Linda Smith was home because he had observed the contrary when he drove-by earlier in the day.

Finally, as Tolley approached the house, a man emerged from it, met him in the driveway and identified himself as the owner. Tolley recognized the self-proclaimed owner as Booth Smith, Linda Smith's husband. The fact that Linda Smith's husband was home and repeatedly refused to answer Tolley's questions about Linda Smith's whereabouts lead Tolley to believe that Booth Smith was attempting to thwart Tolley's service of the arrest warrant. (Patterson Aff. at ¶ 3c). With due respect for Tolley's on-the-spot decision, in perspective of the facts then known, it was reasonable for Tolley to believe that Smith was evading his questions about Linda Smith's whereabouts because Smith was trying to conceal the fact that his wife was at home.[19] *See Magluta,* 44 F.3d at 1535 ("officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home"); *Beck,* 729 F.2d at 1332 (although officers received no response to their knock, "it was reasonable to expect a fugitive to hide or flee if possible").

Smith, of course, could have answered Tolley's inquiry in the negative, rather than refusing to respond at all. When, however, Smith chose to be evasive, he provided further support for Tolley's reasonable belief that one of the three persons whom Tolley had observed in the house at 10:30 p.m. on a week-day was Linda Smith, a person known to regularly reside there.

Before concluding that Tolley's forced entrance into the Smiths' residence was constitutionally permissible under *Payton,* there remains one further issue to address: whether *Payton* applies to service of an arrest warrant issued for a misdemeanor offense, such as that involved here.

### c. An Arrest Warrant for a Misdemeanor Offense also Authorizes a Police Officer to Enter A Suspect's Dwelling

The factual predicate and the language used by the Supreme Court in *Payton,* upon first glance, could lead to the conclusion that the decision may properly be applied only to cases involving warrants issued for felony arrests. This precise issue has not been decided by either the Supreme Court or the Fourth Circuit. For the following reasons, the Court declines to subscribe to such a limited reading of the opinion.

In *Payton,* the Supreme Court granted certiorari to resolve a constitutional challenge brought against a New York statute which permitted police officers to enter private residences without either a search or an arrest warrant in order to make "routine *felony arrests.*" The Court held that "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton,* 445 U.S. at 590, 100 S.Ct. at 1382. In so holding, the Court rejected the state's suggestion that "only a *search warrant* based on probable cause to believe the suspect is at home ... can adequately protect the privacy interests at stake ..." finding instead that:

> if there is sufficient evidence of a citizen's participation in a *felony* to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an *arrest warrant founded on probable cause* implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.

*Payton,* 445 U.S. at 602–03, 100 S.Ct. at 1388 (emphasis added).

The dissenting Justices in *Payton* explicated that, in their view, the majority opinion

---

**19.** It is undisputed that Linda Smith, in fact, was home when Tolley was attempting to effectuate the warrant. (Pl. Answers to Def. Interrogatories 1).

was based upon erroneous assumptions concerning the intrusiveness of home arrest entries. The dissent also believed that the majority position had little support in the common law. Indeed, according to the dissent:

> At common law, absent exigent circumstances, entries to arrest could be made only for *felony*. Even in cases of *felony*, the officers were required to announce their presence, demand admission, and be refused entry before they were entitled to break doors. Further, it seems generally accepted that entries could be made only during daylight hours.
>
> \*　\*　\*　\*　\*　\*
>
> These four restrictions on home arrests— *felony*. knock and announce, daytime, and stringent probable cause—constitute powerful and complementary protections for the privacy interests associated with the home. *The felony requirement guards against abusive or arbitrary enforcement and ensures that invasions of the home occur only in case of the most serious crimes.*

*Payton*, 445 U.S. at 616–17, 100 S.Ct. at 1395 (White J., Dissenting) (emphasis added).

Thus, it is clear that the portion of the *Payton* opinion relating to *warrantless arrests* in the home (*i.e.* arrests without either an arrest or a search warrant) was confined to *felony* arrests. This reading of *Payton* is confirmed by the Supreme Court's decision in *Welsh v. Wisconsin*, 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984), wherein the Court examined whether the Fourth Amendment prohibits the police from making a warrantless entry into a person's home to effectuate an arrest for a non-jailable traffic offense. In finding that exigent circumstances had not been shown, the Court, in *Welsh*, specifically remarked that "[o]ur decision in *Payton*, allowing warrantless home arrests upon a showing of probable cause and exigent circumstances, was also expressly limited to felony arrests." *Id.* at 749–50 n.

11, 104 S.Ct. at 2097 n. 11. The Supreme Court refrained, however, from deciding whether the Fourth Amendment would "impose an absolute ban on warrantless home arrests for certain minor offenses." *Id.* Instead of such a per se rule, the Court held that, because "the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries ... When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the *government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.*" *Id.* at 750, 104 S.Ct. at 2098 (emphasis added).

In sum, in both *Payton* and *Welsh*, the Supreme Court recognized a distinction between felonies and misdemeanors in the context of *warrantless* arrests in a suspect's dwelling.[20] The present action, however, does not involve a *warrantless* arrest because, unlike the law enforcement officers in *Payton* and *Welsh*, Tolley possessed an arrest warrant, which was issued by a court. Therefore, an arrest effectuated pursuant to that warrant would not be considered "presumptively unreasonable" under *Payton* or *Welsh*, because any deprivation of an arrestee's liberty would be sanctioned by a neutral and detached court official rather than by a zealous police officer.

▰▰　Of course, here, no magistrate determined that probable cause existed to enter the Smiths' home. And, it may indeed be preferable, as a matter of policy, for police officers to obtain a search warrant where a minor offense is involved since that would better ensure that "invasions of the home occur only in case of the most serious crimes." *Payton*, 445 U.S. at 616–17, 100 S.Ct. at 1395 (White J., dissenting). But, such a policy is not constitutionally required. This is because the damage suffered by a suspect who is arrested in a residence by a

**20.** This distinction has been recognized in other contexts as well. For instance, under the common law, "an officer needs no warrant to make an arrest if he has probable cause to believe a felony has been committed, but probable cause is

not enough to authorize warrantless arrests for a misdemeanor. The misdemeanor must also have been committed in the officer's presence." *Street v. Surdyka*, 492 F.2d 368, 370 (4th Cir.1974) (citation omitted).

law enforcement officer involves a deprivation of two interests: (i) a privacy interest in the residence; and (ii) a deprivation of the suspect's personal liberty. Yet, when an arrest occurs in the suspect's *own home*, as opposed to the home of a third party, it has been held that the deprivation of both of these interests is authorized so long as an officer possesses an *arrest warrant*, which is secured from a judicial official: "Because an arrest warrant authorizes the police to deprive a person of his liberty, it necessarily also authorizes a limited invasion of that person's privacy interest when it is necessary to arrest him in his home." *Steagald v. United States*, 451 U.S. 204, 214–15 n. 7, 101 S.Ct. 1642, 1648–49 n. 7, 68 L.Ed.2d 38 (1981); *see also Payton*, 445 U.S. at 602–03, 100 S.Ct. at 1388 ("It is true that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen."). Consequently, under this analysis, it is irrelevant whether the underlying offense for which the arrest warrant is secured is a felony or a misdemeanor.

In this action, Linda Smith's arrest warrant was issued by a court. And, therefore, it should, as does a felony arrest warrant, "implicitly carr[y] with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603, 100 S.Ct. at 1388. Once that judicial approval was given, it makes no federal, constitutional difference that the warrant was issued in the form of a bench warrant for failure to appear on a misdemeanor offense, as opposed to a felony offense.[21]

This conclusion finds support in the Second Circuit's decision, *United States v. Spencer*, 684 F.2d 220 (2nd Cir.1982). In *Spencer*, as in this action, a judge issued a bench warrant when a defendant failed to appear in court on misdemeanor charges. Outfitted with the bench warrant, the police officers entered the defendant's dwelling to search for, and to serve the warrant upon, him. The Second

Circuit upheld the constitutionality of the search because "[t]he decision of the ... judge to issue a bench warrant constituted a finding made by a neutral magistrate that [the defendant] had failed to appear in a pending criminal matter." Thus, even if the warrant was not based on a probable cause finding "in the traditional sense," "the presence of the police in the defendant's room was pursuant to a direction made by a neutral magistrate" and conformed with *Payton* because the officers possessed a reasonable basis to believe that the suspect was home. *Id.* at 223; *see also Hunter v. Smith*, 1996 WL 426541 (E.D.Mi.1996).

In so holding, the Second Circuit also rejected the argument that the rule in *Payton* was limited to felony arrests. Instead, the Court found that, although *Payton* involved a felony arrest, a broader reading of *Payton* was justified because the more recent Supreme Court opinion, *Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981), "placed no limitation on the kind of crime with which the suspect must be charged." *Spencer*, 684 F.2d at 223. The Second Circuit further found that in these cases, the Supreme Court "in striving to safeguard a suspect's Fourth Amendment rights when he is arrested at home, emphasized the necessity that a warrant be issued by a neutral magistrate. The concern has been to prevent the unreasonable seizure of a person or property. In determining reasonableness, the nature of the underlying offense is of no moment." *Id.* at 223–24. In any event, according to the Second Circuit, an interpretation of *Payton*, such as the one proffered by *Spencer*, would "grant a misdemeanor suspect blanket protection from arrest while such a person remains at home." Protection of that scope, the Second Circuit found, was not afforded by the maxim that "a man's home is his castle." *Id.* at 224.

 For all of these reasons, the Court finds here that *Payton* is not limited to the service of felony arrest warrants, and its holding—that an arrest warrant carries with it the limited authority to enter a suspect's residence when an officer has reason to be-

---

**21.** It is not at issue in this § 1983 action, and the Court refrains from deciding, whether the offi-

cers here complied with state law regarding the time and manner of serving the warrant.

lieve that the suspect is then present—applies to bench warrants, issued for failure to appear on a misdemeanor charge. Tolley, therefore, is entitled to summary judgment on Smith's Fourth Amendment claims, Count I and II.

## B. Qualified Immunity

■■■ Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *Karsten v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir.1994). However, considering that the same facts which were relevant to the substantive issues also have framed the issues respecting the qualified immunity defense, and that the issue of qualified immunity enjoys a rather unique amenability to appeal, this action presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision. Therefore, the Court concludes that, even had Tolley failed to satisfy the *Payton* test, and even if *Payton* is limited to felony arrests, Tolley is entitled to summary judgment because he is entitled to qualified immunity.

In *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738.

■■■ Because qualified immunity is "an immunity from suit rather than a mere defense to liability," it is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985). The test for qualified immunity is one of objective reasonableness in order to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on sum-

mary judgment." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

■■■ In the context of Fourth Amendment violations brought under 42 U.S.C. § 1983, the Supreme Court has held that immunity from civil liability exists so long as the officials' "actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Moreover,

[T]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful . . . but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

■■■ Thus, the doctrine of qualified immunity extends to law enforcement officers a margin of error "when they navigate uncharted areas at the margins of constitutional criminal law." *Tarantino v. Baker*, 825 F.2d 772, 774 (4th Cir.1987).[22] This is because ". . . there are two levels on which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which the right applies to the actions of the official must also be apparent." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992), cert. denied, 506 U.S. 1080, 113 S.Ct. 1048, 122 L.Ed.2d 356 (1993). Therefore, "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.*

■■■ The availability of qualified immunity is determined against a standard of objective reasonableness. *See Davis v. Scherer*, 468 U.S. 183, 191, 104 S.Ct. at 3017–18, 82 L.Ed.2d 139 (1984). As the Fourth Circuit observed, "[t]he existence of qualified immunity 'generally turns on the objective legal reasonableness of the actions' [citations omit-

---

**22.** The Supreme Court's decision in *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) abrogated *Tarantino* insofar as *Tarantino* limited the plain view doctrine to inadvertent discoveries. *Horton* does not affect those parts of *Tarantino's* holding cited herein.

ted] without regard to the knowledge or subjective intent of the particular official." *American Civil Liberties Union of Maryland, Inc. v. Wicomico County*, 999 F.2d 780, 784 (4th Cir.1993).[23]

■■■■■ On the other hand, the immunity inquiry is filtered through the lens of the officer's perceptions at the time of the incident in question. *Sevigny v. Dicksey*, 846 F.2d 953, 957 (4th Cir.1988). Assessment from that perspective serves two purposes. First, using the officer's perception of the facts at the time limits judicial second-guessing of the reasonableness of the officer's actions with the benefit of 20/20 hindsight which, almost inevitably, is better than the limited opportunity afforded by fast moving, pressure filled events which confront law enforcement officers in the exercise of their daily duties. *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871–72. Second, use of this perspective serves to limit the need for decision-makers to sort through conflicting versions of the "actual" facts and allows them to focus instead on what the police officer reasonably perceived. *Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir.1992) (en banc). In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry, but his perceptions of the objective facts of the incident in question are relevant. *Id. See also, Rowland v. Perry*, 41 F.3d at 172.

■■■■■ On a motion for summary judgment, the Court must determine whether the allegedly violated right was clearly established at the time an action occurred. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. Therefore, if the defendant's entitlement to immunity turns on a factual dispute, that dispute is resolved by the jury at trial. However, if, assuming the facts alleged by the non-moving party to be true, it is still not clear that the official action violated plain-

tiffs' rights, summary judgment is appropriate. See *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039–40. "[T]he burden of establishing that critical issue that the right violated was clearly established under the standard appears to rest on the plaintiff suing the public officer." *Clark v. Link*, 855 F.2d 156, 160–61 (4th Cir.1988). *See also Davis v. Scherer*, 468 U.S. 183, 197, 104 S.Ct. 3012, 3020–21, 82 L.Ed.2d 139 (1984).

■■■ In the present action, Tolley is entitled to qualified immunity because a reasonable officer in Tolley's position could have concluded that Linda Smith resided, and was present, in the Smiths' home at the time Tolley attempted to serve the warrant. A reasonable officer similarly could have concluded that the objectively valid warrant authorized entry into the Smiths' home to effectuate service without consent.

Moreover, even if Tolley lacked legally adequate "reason to believe" that Linda Smith was present at the time of attempted service; and, even if he was mistaken in believing that the arrest warrant authorized his entry, Tolley nonetheless would be entitled to immunity. This is because he did not violate any laws which, at the time of his actions, were 'clearly established' such that a reasonable officer would have known of them.

As demonstrated above, whether Tolley needed probable cause or some degree of certainty less than probable cause remains an unsettled legal matter.[24] This holds particularly true here, where the events forming the basis of this action, and the time when the Court must determine whether the law was "clearly established," occurred on January 10, 1994, prior to the *Magluta, supra,* decision. Finally, if contrary to the holding of *Spencer, supra,* it is found that a law enforcement officer may only enter a residence to serve a felony arrest warrant, and

---

**23.** As the Fourth Circuit explicated in *Rowland v. Perry*, 41 F.3d 167 (4th Cir.1994), "[t]he reasonableness inquiry is an objective one ... To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances ... Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examina-

tion into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case." *Id.* at 172–73 (citations omitted).

**24.** Even if the *Payton* "reason to believe" standard requires some lesser showing than that required to show probable cause, it is also unsettled how much less would be legally acceptable.

not a misdemeanor warrant, that doctrine also remains unsettled. Therefore, Tolley is entitled to qualified immunity as to Smith's claim that Tolley's entrance to his house violated the Fourth and Fourteenth Amendments (Counts I and II).

## C. Unlawful Seizure of Smith

Smith alleges that Tolley willfully disregarded his right to liberty and to be secure in his person when Tolley "attacked, bound, and placed Smith in captivity without consent and over Smith's objections." By this, Smith refers to the fact that Tolley placed Smith in handcuffs and told Smith that he was under arrest. Those actions, Smith claims: (1) violated the right to be secure in his person from unreasonable seizure under the Fourth and Fourteenth Amendments; and (2) violated Smith's due process rights under the United States Constitution to be free from deprivation of his liberty absent a Fourth Amendment warrant issued upon probable cause. (Counts III and IV). Tolley maintains that he was entitled to arrest and handcuff Smith because he possessed probable cause to believe that Smith committed a misdemeanor in his presence.

■■■ Under the common law, "an officer needs no warrant to make an arrest if he has probable cause to believe a felony has been committed, but probable cause is not enough to authorize warrantless arrests for a misdemeanor. The misdemeanor must also have been committed in the officer's presence." *Street v. Surdyka,* 492 F.2d 368, 370 (4th Cir.1974) (citation omitted).[25] In this action, Tolley claims that he had probable cause to arrest Smith because Smith committed a misdemeanor in his presence, namely obstruction of justice or refusal to assist a police officer.

In Virginia, the obstruction of justice statute in effect in 1994, Va.Code Ann. § 18.2–

460, provided that "[i]f any person without just cause knowingly obstructs ... any law enforcement officer in the performance of his duties as such or fails or refuses without just cause to cease such obstruction when requested to do so by such .... law enforcement officer, he shall be guilty of a Class 3 misdemeanor." [26] Thus, the Court must examine whether Tolley had probable cause to believe that Smith committed the offense of obstruction of justice in Tolley's presence.

■■■ "Probable cause exists if 'at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *United States v. McCraw,* 920 F.2d 224, 227 (4th Cir.1990) (quoting *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964)). "Probable cause is based upon the 'totality of the circumstances.'" *McCraw,* 920 F.2d at 227 (quoting *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983)) (other citations omitted). "Only the facts and circumstances known at the time of the arrest may be considered by the court in reviewing probable cause to arrest." *McCraw,* 920 F.2d at 227 (citing *Henry v. United States,* 361 U.S. 98, 103, 80 S.Ct. 168, 171–72, 4 L.Ed.2d 134 (1959)) (other citations omitted).

The assessment in this action is made against the background that Tolley was attempting to serve a valid arrest warrant on Linda Smith. Ten times previously the effort to serve this warrant had failed. But, everyone knew that Linda Smith resided at the address approached by Tolley and Barker on the evening of January 10.

When Tolley and Barker arrived at that address, Smith left his residence to begin a series of confrontational actions by informing

**25.** In *Street,* the Fourth Circuit explained that the Fourth Amendment is broader than the common law rule, and thus, it is constitutionally permissible for an officer to make an arrest whenever the officer has probable cause. Consequently, there exists no cause of action for 'false arrest' under Section 1983 unless the arresting officer lacked probable cause. *Street,* 492 F.2d at 371–73. Because the alleged misdemeanor here was com-

mitted within Tolley's presence, *Street*'s broader holding is unnecessary to this opinion.

**26.** The 1996 amendment to this section substituted "Class 2 misdemeanor" for "Class 3 misdemeanor." The amendment is not relevant to the resolution of Smith's claim.

the officers that they had crossed "No Trespassing" signs. Notwithstanding that Tolley repeatedly informed Smith that he had come to effectuate service of a warrant issued for Linda Smith's arrest, Smith continually refused to answer Tolley's questions about whether his wife was home. While evading Tolley's questions, Smith started back towards his house. Tolley and Barker followed. Once the officers had reached the porch of the Smiths' residence, a person inside the threshold of the home began to videotape Tolley and Smith. The video reflects that Smith was hostile and aggressive at the time. Then, when Tolley again asked about Linda Smith's whereabouts, Smith tried to shut the door in Tolley's face. Tolley stopped that from happening and followed Smith into the house where Smith became even more bellicose. Tolley claims that these facts provided him with probable cause to believe that Smith was obstructing justice.

 An actual assault on a police officer is not necessary to find obstruction of justice under the Virginia statute. *Love v. Commonwealth,* 212 Va. 492, 184 S.E.2d 769, 771 (1971) (quoting *Jones v. Commonwealth,* 141 Va. 471, 126 S.E. 74, 77 (1925)); *see Darnell v. Phillips,* 914 F.2d 247, 1990 WL 134599 (4th Cir.1990) (unpublished opinion). However, "there must be acts clearly demonstrat[ing] an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action and forcible or threatened means." *Love,* 184 S.E.2d at 771 (quoting *Jones,* 126 S.E. at 77); *see Darnell,* at *4. Having viewed the undisputed videotape, the Court finds that Smith's actions clearly demonstrated an intention to prevent Tolley from performing his duties, and therefore, Tolley had probable cause to arrest Smith for obstruction of justice.[27]

The decision cited by Smith in opposition to Tolley's motion, *Miller v. United States,* 230 F.2d 486 (5th Cir.1956), is inapposite. In *Miller,* the Fifth Circuit found that a conviction for obstruction of justice could not stand when the defendant harbored a witness to a bank robbery for several days and denied a law enforcement officer's first request to be admitted to the defendant's home when the officer had no warrant but only a subpoena for the witness. The court in *Miller,* held that, because the officer possessed no search warrant or lawful ground to enter her home, the defendant asserted a right which belonged to her and which the officer could not lawfully take away. *Id.* at 489. Hence, the defendant could not be criminally punished for having asserted that right.

In this case, unlike the law enforcement officer in *Miller,* Tolley possessed an *arrest warrant,* which, as discussed above, lawfully entitled him to enter the Smiths' home to effectuate service. The warrant, therefore, gave Tolley the authority to prevent Booth Smith from exercising his right to privacy in his home. And thus, unlike the defendant in *Miller,* Smith was not asserting a right which he possessed.[28] In sum, because Tolley had probable cause to arrest Smith for obstruction of justice, Tolley is entitled to summary judgment on Smith's unlawful seizure claims, Counts III and IV.

### 1. Qualified Immunity

Tolley would be entitled to summary judgment on qualified immunity grounds even if he incorrectly believed that he had probable cause to arrest Smith. Indeed, in addressing qualified immunity where the existence of probable cause has been challenged, the Supreme Court has stated that qualified immunity shields law enforcement officers from suit for damages if:

27. In so finding, it is unnecessary to decide whether Tolley had probable cause to arrest Smith for the offense "Refusal to Aid Officer in Execution of His Office," which provides, "[i]f any person on being required by any sheriff or other officer refuse or neglect to assist him: (1) in the execution of his office in a criminal case, (2) in the preservation of the peace, (3) in the apprehending or securing of any person for a

breach of the peace, or (4) in any case of escape or rescue, he shall be guilty of a Class 2 misdemeanor." Va.Code Ann. § 18.2–463.

28. Indeed, the defendant in *Miller* did not obstruct the law enforcement officer's entry into her home once the officer had obtained an arrest warrant.

"a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity. *Ibid.* Moreover, because "[t]he entitlement is an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985), we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation

\* \* \* \* \* \*

[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact.

\* \* \* \* \* \*

The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' *Malley, supra,* 475 U.S. at 341, 343 [106 S.Ct. at 1096, 1097].

*Hunter v. Bryant*, 502 U.S. 224, 226–29, 112 S.Ct. 534, 535–37, 116 L.Ed.2d 589 (1991) (citations omitted).

On several occasions, the Fourth Circuit has examined whether qualified immunity would protect law enforcement officers from liability in cases involving arrests under the Commonwealth of Virginia's obstruction of justice statute. For instance, in *Darnell v. Phillips*, 914 F.2d 247, 1990 WL 134599 (4th Cir.1990), the Fourth Circuit ruled that Virginia's obstruction of justice statute was unclear, finding that: "[w]hile it is clear under Virginia law that assault of a police officer is not necessary to constitute obstruction of

justice, it is unclear what conduct short of an assault is sufficiently disruptive to violate the statute." *Id.*[29] This basis alone—the unclarity of the statute's parameters—entitles Tolley to qualified immunity.

Moreover, under circumstances similar to the present action, the Fourth Circuit has found that qualified immunity protected police officers from liability. For example, in *Commercial Energies, Inc. v. United Airlines, Inc.*, 25 F.3d 1038, 1994 WL 251849 (4th Cir.1994) (unpublished opinion), the Fourth Circuit concluded that an officer had not acted improperly, but if he did, he enjoyed qualified immunity when he arrested a person who was "identified as one of [ ] two black men who allegedly attacked a United Airlines flight attendant. When [the person] refused to answer [the] [o]fficer['s] questions and attempted to leave when the officer was in the process of investigating the attack, [the] [o]fficer could reasonably have believed that [the] person was obstructing justice in violation of Va.Code. § 18.2–460." *Id.* at \*3. And, in *Maitilasso v. Timberlake*, 76 F.3d 374, 1996 WL 44109 (4th Cir.1996) (unpublished opinion), the Fourth Circuit ruled that a reasonably competent officer could conclude that there was probable cause to arrest a person for obstruction of justice when that person was under investigation for felonious crimes and refused to comply with an objectively valid search warrant to obtain the person's fingerprints for identity purposes. *Id.*[30]

In the present action, given the totality of the facts and circumstances, the Court finds that a reasonably competent police officer could have concluded that Smith knowingly tried to prevent a law enforcement officer from serving an objectively valid arrest warrant by his obstreperous behavior, his obstinate refusal to answer Tolley's questions, his videotaping of the events, and his shutting the door in Tolley's face. Based on these facts, a reasonably competent officer in Tol-

---

**29.** Smith has not advanced a facial challenge to Virginia's obstruction of justice statute. Hence, the only issue before the Court is whether Tolley possessed probable cause to arrest Smith for obstruction of justice.

**30.** These unpublished opinions do not carry precedential weight respecting the topics therein decided, but they help illustrate how Virginia's obstruction of justice statute has been interpreted.

ley's position could have concluded that Smith had violated Virginia's obstruction of justice statute, Va.Code Ann. § 18.2–460. Therefore, Tolley is entitled to qualified immunity.

■■■ Before concluding, the Court also decides that qualified immunity protects Tolley from liability notwithstanding that, apparently in arresting Smith, Tolley was disciplined for violating the County Policy sections on "Knowledge of Laws and Regulations" and "Professional Attitude." First, the policies which Tolley purportedly violated are standards that exceed, by far, anything required of him under federal or constitutional law. And, for that reason alone, any violation of those policies would not be actionable under Section 1983, which provides a remedy only for violations of federal or constitutional law. 42 U.S.C. § 1983;[31] see Clark v. Link, 855 F.2d 156, 161 (4th Cir.1988).

■■■ Second, the decision to discipline Tolley was made with the benefit of hindsight. So, even if the decision was proper (which is highly doubtful), it is irrelevant to the qualified immunity analysis, which requires assessment of whether Tolley "acted reasonably under settled law in the circumstances, not whether another reasonable or more reasonable interpretation of the events can be constructed five years after the fact." Hunter v. Bryant, 502 U.S. at 228, 112 S.Ct. at 537. In this action, given the circumstances, Tolley clearly acted reasonably throughout his encounter with Smith.

■■■ Finally, even if Tolley made some mistakes, (and indeed, Tolley even acknowledged that he may have), the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." Id. The videotape demonstrates neither that Tolley was plainly incompetent nor that he knowingly violated the law. To the contrary, the video shows that Tolley is a competent officer, who exhibited the highest level of professionalism, even under the most trying of circumstances.

In conclusion, Tolley's motion for summary judgment is granted as to Smith's various claims that Tolley violated the United States Constitution by entering the Smiths' home and seizing Smith, (Counts III and IV).

## MISCELLANEOUS CLAIMS

■■■ Smith also alleges that Tolley falsely arrested and imprisoned him in violation of the common law of Virginia. Section 1367(c) of Title 28, United States Code provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). As described above, all claims over which this Court has subject matter jurisdiction have been dismissed. Therefore, pursuant to Section 1367(c)(3), Smith's false arrest and false imprisonment common law tort claims (Count VI) are dismissed without prejudice. However, the Court dismisses with prejudice, Smith's claim that Tolley caused him mental suffering (Count VII). This allegation clearly fails to state a claim for which relief may be granted under Fed.R.Civ.P. 12(b)(6) because mental suffering describes a type of damage not a cause of action.

Consequently, for the reasons stated above, Tolley's Motion for Summary Judgment is granted and the case is dismissed.

## CONCLUSION

Every citizen of this country is entitled to the protection afforded by the Constitution and it is the duty of the federal courts to vindicate violations of the rights which that cherished document affords. To that end, the federal courts are open to citizens whether or not they are represented by counsel.

---

31. The record does not explain why those who disciplined Tolley decided to take that action. The Court finds no basis for sanction in Tolley's conduct either by comparing his conduct to the text of the county's policy or otherwise. To the contrary, Tolley should be commended for maintaining his composure and for his polite treatment of a citizen who rudely treated, harassed, and obviously baited Tolley. Indeed, Smith's conduct toward Tolley and the enforcement of the law was simply unacceptable.

This action presents a rather extreme example of a citizen who has abused this open door policy, by frivolously, indeed, maliciously, asserting constitutional rights. In the process, that citizen needlessly caused numerous defendants to incur legal fees and expenses. Likewise, he unnecessarily consumed limited judicial resources which could have been devoted to legitimate claims. He also has cheapened, for all citizens, the very rights on which he so spuriously has based the claims he so baselessly has raised here.

This action is but one of several brought by Smith, alone or with his wife, Linda, based upon fanciful interpretations of state or federal laws which, they say, confer upon them freedom to disobey laws which bind all other citizens. For example, the Smiths have claimed to be free from the obligation to register and to secure license plates for their cars. And when, unsurprisingly, the state has attempted to enforce its laws, the Smiths have come to this Court alleging that the enforcement violates their federal constitutional rights.[32]

This action follows the same pattern because, once again Smith refused to obey the command of state law based on his fanciful interpretation of that law and the federal Constitution. The warrant which Tolley was instructed to serve was issued at the direction of a state judge when Linda Smith did not appear for a state trial on charges against her.[33] At least ten other attempts to serve it had been avoided.

In this instance, when Tolley and Barker attempted to serve the warrant late in the evening on January 10, 1994, Linda Smith was in the house, and, when Smith saw the officers, he surely knew that they had come to make yet another attempt at service. Smith had a friend set up a video camera and, after turning on the bright lights, in fact, embarked upon the first step of a confrontational strategy which, as is shown by the videotape, Smith escalated by becoming increasingly abusive and bellicose with each development.

Then, as his abuse progressed from level to level, Smith checked with the cameraman to see that reactions were recorded. Smith then called his friend for assistance. His friend arrived and, as if on cue, used the same basic theme lines of constitutional jargon, and joined in the baiting of Tolley. All the while, Smith spouted legal platitudes and repeatedly threatened to sue Tolley. Smith's conduct became more and more aggressive as he continued to threaten, harass, berate and bait Tolley.

The circumstances of the confrontation orchestrated by Smith, the language which he used, the tone of voice, the aggressive posture and conduct and the recording of the events,[34] all point to the conclusion that Smith deliberately embarked on a course which he, rather erroneously, thought would permit him to bring an action alleging the violation of his constitutional rights. Tolley, however, did not rise to the bait. Rather, he maintained composure and finally departed without serving the warrant to avoid further confrontation.

That, of course, did not dissuade Smith from filing this action which, as explained above, is lacking in merit and therefore dismissed. But, neither that relief for Tolley nor the dismissal of Smith's claims provides sufficient protection for those upon whom Smith may visit similar frivolous claims in the future. No officer of the law should be forced to endure aggressive baiting designed to provoke a constitutional claim. No local government ought to be required to act in apprehension of vindictive law suits orchestrated by Smith. No defendant ought needlessly to incur legal fees and expenses to defend claims of the ilk presented here and in other actions filed by Smith in this court. Constitutional rights may not be invoked

---

32. Civ. No. 3:95cv1009.

33. Thus, there is no serious question that the warrant was valid. But, when the police department received letters from Smith challenging the validity of the warrant, the challenge was taken seriously and thoroughly investigated. (Pittman Aff. ¶ 5).

34. Smith asserts that he recorded the events as protection against police abuse. However, nothing in the record suggests that either Smith or his wife had experienced abuse at the hands of the police.

frivolously or for the purpose of abuse. And, the federal courts must not be required to waste their limited judicial resources in entertaining such actions.

 Booth and Linda Smith have clearly abused their rights to freely access this Court, and they are, therefore, warned that should such abuse continue, the Court will order them to show cause why a system of pre-filing review should not be instituted to preclude the access which is reserved for honest, genuine complaints, not for the tripe that has been visited upon this Court and the defendants. *See Dixon v. Nisley,* 840 F.Supp. 49 (E.D.Va.1994).

The Clerk is directed to send a copy of this Memorandum Opinion to Booth Smith and to all counsel of record.

It is so ORDERED.