**Michael Thomas WILSON, Plaintiff,**

v.

**Barry A. KITTOE, and Anthony S. Tokach, Defendants.**

**No. 5:01CV00032.**

United States District Court, W.D. Virginia, Harrisonburg Division.

Nov. 7, 2002.

George Lynwood Freeman, Jr., Fairfax, VA, for Michael Thomas Wilson.

William Thomas Kennard, Rockville, MD, Alexander Francuzenko, O'Connell & O'Connell, Rockville, MD, for Barry A. Kittoe.

Alexander Francuzenko, O'Connell & O'Connell, Rockville, MD, for Anthony S. Tokach.

## MEMORANDUM OPINION

TURK, Senior District Judge.

Plaintiff brings this action under 42 U.S.C. § 1983, claiming that he was arrested by the defendants without probable cause and imprisoned in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments. The defendants move for summary judgment, arguing that no constitutional right held by the plaintiff has been violated and that both officers are protected from suit under the doctrine of qualified immunity. Oral arguments were heard on October 28, 2002, and this Motion is ripe for resolution.

### Background

Around three o'clock in the morning of April 14, 1999, the plaintiff, Michael T. Wilson ("Wilson"), awoke to what sounded like a car backfiring. After hearing the noise for the third time, Wilson got out of bed to try and discover the source of the commotion. Wilson looked out his bedroom window and saw two cars pulling into his neighbor's driveway. The second car was idling in the driveway with its lights on. Wilson got dressed and went downstairs to see if there was a problem at his neighbor's house.

It was still dark outside, so Wilson flipped on his outside lights and walked out onto his driveway. The first thing

Wilson saw was his neighbor's son, Seth Woolever ("Woolever"), in the custody of a police officer, Officer Barry A. Kittoe ("Kittoe"), in the Woolever's driveway.[1] Wilson believed that Woolever had already been placed into handcuffs, as his arms were down by his side. Wilson could tell that the police officer was talking to Woolever. However, it was difficult to hear the conversation between the two men, as the engine of the cruiser was idling and the two were standing on the other side of the police cruiser away from Wilson, around thirty feet away from where Wilson was standing.

Wilson stood there for a minute or two before Officer Kittoe realized his presence. Officer Kittoe asked Wilson who he was, and Wilson told Officer Kittoe that he lived next door. Officer Kittoe then asked Wilson if he had called in a complaint. When Officer Kittoe heard that Wilson had not made any complaint, he told Wilson to "get out of here" as he was "interfering with [the] investigation."

Wilson did not respond to Officer Kittoe and instead asked Woolever if he was "okay." Woolever said he "wasn't sure." Wilson then asked Woolever if he wanted Wilson to represent him, as Wilson was an attorney, and he had performed legal services for the Woolever family on prior occasions. Woolever was a little more responsive to this question, answering "I'll be looking at needing the services of an attorney" and "I want you to represent me."

At this point, while Woolever was in custody, Wilson asked Officer Kittoe if, after the Officer was finished with what he was doing, he could have a moment to

---

1. The officer, Barry A. Kittoe, originally began following Woolever's car after receiving a call regarding an erratic driver. He witnessed Woolever driving erratically with no headlights. Upon stopping the car and asking Woolever to exit the vehicle, Officer Kittoe observed that Woolever had difficulty maintaining his balance and that a strong odor of alcohol came from his person. In addition, Woolever's eyes were bloodshot and his speech was slurred.

speak with his client and give him one of his business cards. Officer Kittoe responded by telling Wilson that he was interfering with his investigation. Wilson told Officer Kittoe that he would go back into his house and get some identification. Wilson walked into the house and left the door open.

What happened next is the subject of some dispute. Wilson states that when he returned to the scene a minute or two later holding his wallet and card case, he noticed that another officer, Officer Timothy Smedley, had arrived in a second cruiser which was parked in the street between Wilson's driveway and the Woolever driveway where Officer Kittoe and Woolever were standing. Wilson testifies that he proceeded down his driveway to the second cruiser without talking to Officer Kittoe because he knew that Officer Kittoe was busy. In any event, Wilson walked up to Officer Smedley, who was standing in the street next to the second police cruiser.

Wilson introduced himself to Officer Smedley as a lawyer, and he handed the Officer one of his cards. Wilson asked Officer Smedley if he could speak to his client when the officers were done with him. Officer Smedley told Wilson that he was just on the scene to assist; Officer Kittoe was in charge. After this conversation, Wilson and Officer Smedley simply stood there for a moment next to the second cruiser.

At this point, Officer Kittoe left Woolever in handcuffs and walked down to where Wilson and Officer Smedley were standing. Officer Kittoe approached Wilson and in-

formed him again that he was interfering with his investigation. Officer Kittoe ordered Wilson to leave the area. Wilson told Officer Kittoe that he understood that Officer Kittoe "had a job to do," but that, as an attorney, "he had a job to do as well." Wilson explained to Officer Kittoe that he just wanted to speak with Woolever for a moment when Officer Kittoe was finished doing "whatever it was" that he was doing. Then Wilson informed Officer Kittoe that "any information" that he elicited from Woolever as a result of questioning "will be suppressed at trial under the Exclusionary Rule." [2]

After this exchange, Officer Kittoe stared at Wilson for a few seconds before telling him that he was under arrest. Wilson was handcuffed and put in Officer Smedley's police cruiser. Soon after the arrest, a third police vehicle, driven by Lieutenant Anthony S. Tokach, arrived on the scene. Wilson testifies that he saw Lieutenant Tokach get out of his vehicle and go over to Officer Kittoe. Lieutenant Tokach and Officer Kittoe allegedly spoke for a moment or two before the Lieutenant walked over to Officer Smedley. After speaking with the Lieutenant, Officer Smedley came over to the police cruiser and offered to remove the handcuffs from Wilson.

Wilson was eventually driven to the regional jail where he was again handcuffed before entering the jail. Once inside the jail, Wilson's shirt and shoes were removed, and he sat, handcuffed, until 6:30 in the morning, at which time he was issued a summons and released. [3]

---

**2.** The defense's recitation of the facts in its Motion for Summary Judgment is abbreviated at best. Concerning the events following Wilson's return from his house, the defense states that "Wilson continued to argue with Kittoe regarding Miranda rights and other issues. Wilson continued to comment to Woolever, Kittoe and Deputy Timothy Smedley. Wilson was asked again to leave the area, and then was ordered to leave the area and informed that he was interfering with a police investigation. As a result of Wilson's continued conduct, and refusal to comply with Kittoe's order, he was arrested."

**3.** The Commonwealth's Attorney for Frederick County decided to *nol prosecute* the case against the plaintiff.

## Analysis

The defendants move for summary judgment on the grounds of qualified immunity. Upon motion for summary judgment, the Court must view the facts, and inferences to be drawn from those facts, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 236–37 (4th Cir.1995). The party seeking summary judgment must come forward and demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

The Fourth Circuit has identified the importance of resolving the question of qualified immunity at the summary judgment stage rather than at trial. *See Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir.1992) ("Because qualified immunity is designed to shield officers not only from liability but from the burdens of litigation, its establishment at the pleading or summary judgment stage has been specifically encouraged."). However, the importance of summary judgment in qualified immunity cases "does not mean ... that summary judgment doctrine is to be skewed from its ordinary operation to give special substantive favor to the defense, important as may be its early establishment." *Id.* at 313. The standard for summary judgment in qualified immunity cases remains whether (1) there is any genuine issue of material fact and (2) on the undisputed facts the defendant as movant is entitled to judgment as a matter of law. *Id.*

## I.

### Qualified Immunity

In *Harlow v. Fitzgerald*, the Supreme Court laid out the modern objective standard for evaluating qualified immunity claims. 457 U.S. 800, 813–14, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982). In so doing, the Court identified the pressures which prompted the use of a doctrine of qualified immunity for government officials acting in their official capacities: "In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees.... At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty ... at a cost not only to the defendant officials, but to society as a whole." *Id.*

The need for a dispute mechanism to satisfy the legitimate claims of individuals who have had their constitutional rights violated by government officials while preventing illegitimate claims from overburdening the justice system is heightened in the context of police officials acting to protect the safety of the public. *See Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir.1991) ("These concerns are particularly acute when the officials are police officers investigating a crime of violence. The police must have the ability to move quickly to solve the crime .... The ability of police officers to protect the public can be severely hampered, however, if their every decision is subject to second-guessing in a lawsuit."). While cases like *Torchinsky* mainly focus on the impact of illegitimate claims on the justice system when examining suits against police officers, it is important to remember that the constitutional rights side of the qualified immunity balance is equally heightened when police officers are involved. Police officers, as the primary arbiters of constitutional justice

imbued with a great degree of discretion, always carry with them the possibility for abuse of their powers. *See, e.g., City of Houston, Texas v. Hill*, 482 U.S. 451, 466–67, 107 S.Ct. 2502, 2512, 96 L.Ed.2d 398 (1987). Thus, when examining claims against police officers, the dangers are heightened, but the balance remains.

■ Three separate questions must be answered in determining whether a defendant is entitled to the defense of qualified immunity: (1) Was a specific right held by the plaintiff violated?; (2) Was the right clearly established at the time of the alleged violation?; (3) If a clearly established right was violated, would a reasonable person in the officer's position have known that doing what he did would violate that right? *See Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir.2000); *Pritchett*, 973 F.2d at 312; *Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir.1990).

■ The first two questions in the qualified immunity analysis are pure questions of law and are amenable to resolution by the Court at the summary judgment stage. *See Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Pritchett*, 973 F.2d at 312; *Collinson*, 895 F.2d at 998. However, the third question, involving application of the first two elements to the particular facts of the case, is more difficult for a court to resolve as a question of law, as it possibly requires "factual determinations respecting disputed aspects of that conduct." *Pritchett*, 973 F.2d at 312.

## A.

## Violation of a Specific Constitutional Right

The plaintiff alleges that he was arrested unlawfully in violation of the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (Pl.'s Compl. ¶ 17) For purposes of this analysis, it is enough to identify a single right of the plaintiff that could have been violated. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, states in pertinent part that "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." U.S. Const. Amend. IV. The essential question under this initial element of the test of qualified immunity is whether Officer Kittoe had probable cause to arrest the plaintiff.[4]

■ In the context of the Fourth Amendment, the Fourth Circuit has defined probable cause as "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Pritchett*, 973 F.2d at 314. It is possible for probable cause to be lacking in an arrest due to a misunderstanding of either fact or law, as probable cause is viewed in light of the "suspect's conduct as known to the officer" and the "contours of the offense thought to be committed." *Pritchett*, 973 F.2d at 314;

---

4. In the Motion for Summary Judgment, the defendants assert that plaintiff has no constitutional right to provide legal services during an arrest or to disobey a police officer. While the defendants are correct that these rights are not enumerated in the text of the Constitution, it is incorrect to look only at the right of the plaintiff from the perspective of the government official. Whatever his other rights were, plaintiff clearly had the right not to be arrested in the absence of probable cause. The plaintiff's actions in disobeying Officer Kittoe's orders and attempting to act as legal counsel during the arrest will be discussed in the probable cause inquiry.

*see also Henderson v. Simms*, 223 F.3d at 271; *Carter, Jr. v. Jess*, 179 F.Supp.2d 534, 545 (D.Md.2001). When examining the facts and the law, it is important to limit the examination to only those "facts and circumstances known [to the officer] at the time of the arrest." *Smith v. Tolley*, 960 F.Supp. 977, 994 (E.D.Va.1997); *see also Gooden v. Howard County*, 954 F.2d 960, 965 (4th Cir.1992) ("In cases where officers are hurriedly called to the scene of the disturbance, the reasonableness of their response must be gauged against the reasonableness of their perceptions, not against what may later be found to have actually taken place.").

This Court is sensitive to the fact that, in making the probable cause determination, it sits safely in chambers with the benefit of hindsight, while a police officer making an arrest faces split second, life-or-death decisions. *See Gooden*, 954 F.2d at 964–65 ("The immunity is to be applied with due respect for the perspective of police officers on the scene and not with the greater leisure and acquired wisdom of judicial hindsight.");*Smith*, 960 F.Supp. at 993; *Reynolds v. Hale*, 855 F.Supp. 147, 149 (S.D.W.Va.1994). Indeed, the Fourth Circuit has recognized the possible stifling effect that judicial second guessing could have on law enforcement. *See Pinder v. Johnson PFC*, 54 F.3d 1169, 1173 (4th Cir.1995); *Torchinsky*, 942 F.2d at 261. If courts were openly hostile towards law enforcement in the qualified immunity context, officers would think about liability first before acting in an environment of uncertainty.*Id.*

In the present situation, plaintiff was arrested for obstructing justice in violation of Va.Code Ann. § 18.2–460A (Michie 1996 & Supp.2002). Section 18.2–460A states in pertinent part, "If any person without just cause knowingly obstructs ... any law-enforcement officer in the performance of his duties as such or fails or refuses with-out just cause to cease such obstruction when requested to do so by such ... law-enforcement officer, he shall be guilty of a Class 1 misdemeanor." Thus, in order to have had probable cause to arrest, Officer Kittoe must have had a reasonable belief that plaintiff intended to obstruct him in the performance of his duties.

There are two forms of obstruction that the defendant cites throughout its Motion for Summary Judgment as proof of probable cause: (1) plaintiff's verbal criticism of Officer Kittoe and offer of legal services during the arrest and (2) plaintiff's refusal to leave the area and cease the obstruction. For reasons that will become readily apparent, the merit of the defendant's arguments supporting probable cause should be analyzed separately. The Court will first examine whether the plaintiff's words during the arrest constitute probable cause that the plaintiff intended to obstruct justice.

## 1.

### Plaintiff's Criticism of Officer Kittoe

■ It appears that much of the plaintiff's conduct complained about by the defense was verbal. (Mot. for Summ. J. at 7–8) The plaintiff's alleged verbal obstruction consisted of four separate conversations with the police on the morning of April 14, 1999. First, while standing in his own driveway about thirty feet away from the scene of the arrest, plaintiff asked Woolever whether he was "okay" and whether he needed legal representation. (Wilson Dep. at 48) Second, while in the same position, plaintiff asked Officer Kittoe if, when the officer was finished with the arrest, he could give one of his cards to Woolever. *Id.* Third, when plaintiff returned from his house with his legal identification, he walked over to Officer Smedley in the street and again asked permission to give Woolever his card. *Id.* at 57–58. Finally, when Officer Kittoe walked over to

Officer Smedley and the plaintiff, the plaintiff informed Officer Kittoe of Woolever's constitutional rights. *Id.* at 58–59. In response to the second and fourth interruptions, Officer Kittoe informed the plaintiff that he was interfering with the officer's investigation. *Id.* at 48, 58. After the plaintiff argued with Officer Kittoe concerning Woolever's constitutional rights, he was arrested. *Id.* at 59.[5]

The face of the Virginia statute appears to reach mere language that tends to interfere with a police officer's investigation, as the statute prohibits any "obstruction" of an officer without qualification. Va.Code Ann. § 18.2–460A. In addition, the statute has been construed so that an actual physical assault on a police officer is not required for a violation of the statute. *See Smith v. Tolley,* 960 F.Supp. at 995. However, the statute has been limited so that a person must do more than merely impede the process of arrest:

> "To constitute obstruction of an officer in the performance of his duty, it is not necessary that there be an actual or technical assault upon the officer, but there must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action and forcible or threatened means. It means to obstruct the officer himself not

merely to oppose or impede the process with which the officer is armed."

*Jones v. Commonwealth,* 141 Va. 471, 478–79, 126 S.E. 74, 77 (1925) ( *quoting* Brill's Cyc. of Criminal Law § 1156); *see also Polk v. Commonwealth,* 4 Va.App. 590, 594, 358 S.E.2d 770, 772 (Va.App.1987); *Ruckman v. Commonwealth,* 28 Va.App. 428, 429, 505 S.E.2d 388, 389 (1998); *Smith v. Tolley,* 960 F.Supp. at 995. The Fourth Circuit adopted the distinction between impeding the process and impeding the officer in *Rogers v. Pendleton,* 249 F.3d 279, 291 (4th Cir.2001).

■ As it has been consistently held that peaceful verbal criticism of a police officer cannot be targeted under a general obstruction of justice statute, speech alone does not constitute "opposition or resistance" of a police officer "by direct action."

> "The general rule is that merely remonstrating with an officer in behalf of another, or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties.... It logically follows that a citizen may advise another of his constitutional rights in an orderly and peaceable manner while the officer is performing his duty without necessarily obstructing

---

5. Factually, these encounters provide little support for the defense's suggestion that there was probable cause to arrest, as the statute requires intent. Va.Code Ann. § 18.2–460A ("If a person without just cause 'knowingly' obstructs ...."); *see also Jones v. Commonwealth,* 141 Va. 471, 478–79, 126 S.E. 74, 77 (1925) ("[T]here must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty."). Viewing the facts in the light most favorable to the non-moving party, it appears as if there is little support in the record to prove an intent to violate. In fact, the evidence tends to prove exactly the opposite.

Plaintiff testified in his deposition that he acted so as to avoid obstructing the arrest itself, walking down the driveway to talk to Officer Smedley instead of approaching Officer Kittoe. (Wilson Dep. at 57) Both times that Officer Kittoe spoke to the police, he only requested time to speak to Woolever after the officers "finish[ed] whatever [they were] doing." (Wilson Dep. at 48) However, because this Court is reluctant to second guess the perceptions of officers present at the scene of an arrest, it is important to determine whether there is any obvious legal deficiency in Officer Kittoe's determination of probable cause.

or delaying the officer in the performance of his duty."

*Brooks v. NC Department of Correction,* 984 F.Supp. 940, 955 (E.D.N.C.1997) ( *quoting State v. Leigh,* 278 N.C. 243, 246, 179 S.E.2d 708, 709–10 (1971)). The right to criticize the actions of a police officer during an arrest is held by those individuals actually being arrested, *see Norwell v. City of Cincinnati, Ohio,* 414 U.S. 14, 16, 94 S.Ct. 187, 188, 38 L.Ed.2d 170 (1973) (holding that an individual's arrest was unlawful, as an individual "is not to be punished for nonproactively voicing his objection to what he obviously felt was a highly questionable detention by a police officer"); *Ford v. City of Newport News,* 23 Va.App. 137, 143, 474 S.E.2d 848, 850–51 (1996) (throwing out a disorderly conduct conviction on the basis that Virginia section 415 requires a "direct tendency to cause acts of violence" out of "concern for First Amendment free speech protections"); *Marttila v. City of Lynchburg,* 33 Va.App. 592, 535 S.E.2d 693 (2000) (overturning conviction for breach of the peace), as well as by third parties witnessing an arrest, *see City of Houston, Texas v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (protecting the right of a third party to verbally protest the treatment of a friend by the police); *Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974) (examining the arrest of a third party for cursing at police officers); *Brooks,* 984 F.Supp. 940 (vacating the conviction of an individual under an obstruction statute for verbally protesting the treatment by the police of a young boy).

In addition to critical speech of police officers falling short of probable cause to arrest under the obstruction of justice statute, the Supreme Court has held that an arrest on the basis of such speech is unconstitutional: "The Constitution does not allow such speech to be made a crime. The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principle characteristics by which we distinguish a free nation from a police state." *Hill,* 482 U.S. at 462–63, 107 S.Ct. at 2510 (striking down a municipal ordinance which made it illegal to "in any manner oppose, molest, abuse, or interrupt any policeman in the execution of his duty" as unconstitutionally overbroad under the First Amendment)[6]; *see also Lewis v. City of New Orleans,* 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (striking down an ordinance prohibiting people from cursing or reviling police officers while in the performance of their duties). Prohibiting constitutionally protected criticism of police officers through a general "obstruction of justice" statute places "unconstitutional discretion" in the hands of police officers. *See Hill,* 482 U.S. at 466–67, 107 S.Ct. at 2512. The result of such discretion is to choke off First Amendment freedoms broadly, as it would be impossible to determine from the face of the statute when protected speech would be criminalized by an individual police officer. *Id.* at 467, 107 S.Ct. at 2512.

Courts applying the Supreme Court's reasoning in *Hill* have even extended First Amendment protections to obscene criticisms of the police which arguably lie on the outskirts of protected expression. *See,*

---

6. The Supreme Court in *Hill* cited to a number of other common law cases which supported the notion that prohibiting any speech that obstructs a police officer is an unconstitutional act, including *Levy v. Edwards,* 1 Car. & P. 40, 171 Eng.Rep. 1094 (Nisi Prius 1823), which the Court cites for the proposition that a third party who objects to the arrest of a boy by telling a constable "you have no right to handcuff the boy" has committed no crime and cannot be arrested.

e.g., *Marttila*, 33 Va.App. 592, 535 S.E.2d 693 (holding that it is not a breach of the peace to refer to officers as "fucking pigs" and "fucking jokes" during an arrest). The basis for this extension of the right to criticize officers is the expectation placed on "properly trained police officers . . . to exercise greater restraint in their response than the average citizen." [7] *Id.* at 602, 535 S.E.2d at 698.

In the present case, the risk of abuse posed in allowing the suppression of speech critical of police officers in the performance of their duties comes sharply into focus. The plaintiff attempted to inquire into the well-being of his neighbor's son and wished to offer his services in support. (Wilson Dep. at 47–48) When challenged by the arresting officer to end the speech and leave the area, the plaintiff peacefully attempted to remind the officer of the boy's constitutional rights. *Id.* at 58–59. In the face of this peaceful, unobtrusive speech, Officer Kittoe abused his discretion in arresting the Plaintiff under the Virginia obstruction of justice statute.[8]

The closely analogous case of *Brooks v. NC Department of Correction*, 984 F.Supp. 940, lends support to this conclusion. In *Brooks*, the petitioner was asleep in his home and was awakened by the sound of a commotion outside. *Id.* at 943. Petitioner walked into his yard and saw a police officer cursing loudly at a thirteen-year-old boy in his custody. *Id.* Petitioner became upset and began to angrily criticize the officer's conduct. *Id.* Each time that he was asked to leave the area, petitioner refused. *Id.* Petitioner was then arrested under a North Carolina statute which, at the time of the arrest, was almost identical to the Virginia obstruction statute: "If any person shall willfully and unlawfully resist, delay, or obstruct a public officer in discharging or attempting to discharge a duty of his office, he shall be guilty of a misdemeanor." *Id.* at 953. Upon review of the petitioner's writ of *habeas corpus*, the district court vacated the conviction as violative of the First and Fourteenth Amendments. *Id.* at 961.

██ Peaceful criticism directed at police officers during an arrest does not constitute "direct action" for purposes of Va. Code Ann. § 18.2–460A. Based on an examination of the cases cited above, Officer Kittoe could not have reasonably concluded that he had probable cause to arrest the plaintiff on the basis of plaintiff's comments, and he should have concluded that such an arrest would violate the plaintiff's right to peacefully criticize Officer Kittoe's

---

**7.** While it is clear that peaceful speech and even obscene, loud speech is not prohibited by 18.2–460A, state and local governments are not without recourse to protect against dangerous speech. As the Supreme Court noted in *Hill*, "The freedom verbally to challenge police action is not without limits, of course; we have recognized that 'fighting words' which 'by their very utterance inflict injury or tend to incite an immediate breach of the peace' are not constitutionally protected." 482 U.S. at 463, 107 S.Ct. at 2510 ( quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

**8.** Holding that Officer Kittoe had probable cause to arrest the plaintiff in light of *Hill* and *Lewis* would create a constitutional problem with Va.Code Ann. § 18.2–460A. This Court has not been asked to declare the statute unconstitutional, and it is not prepared to do so when a limiting construction has been applied by the state courts of Virginia in a rational manner so as to clearly limit the reach of the statute to "direct action." Holding that "direct action" does not encompass peaceful criticism of the police is "reasonable" and "readily apparent" according to federal and state case law. *See Virginia Society for Human Life, Inc. v. Caldwell*, 152 F.3d 268 (4th Cir.1998).

As the constitutionality of the statute itself is not at issue, there is no reason to abstain from deciding the case. *See Railroad Commission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

actions under the First Amendment. Thus, Officer Kittoe, in making the arrest, abused the statute in a manner that violated the plaintiff's rights under the First and Fourth Amendments.

### 2.
### Refusing to Obey Officer Kittoe's Orders

■ The second piece of evidence of probable cause that the defense gives in its Motion for Summary Judgment is the plaintiff's refusal to obey Officer Kittoe's orders. Officer Kittoe told plaintiff that he was obstructing his investigation on three occasions, and each time he asked the plaintiff to "leave the area." (Wilson Dep. at 82) The first time he gave the order, the plaintiff was standing in his driveway, almost thirty feet from where the arrest was taking place. (Barbara Woolever Dep. at 24) When given the order, plaintiff inquired as to Woolever's condition, and he asked Officer Kittoe if, after the officer had concluded his business, he could speak with Woolever. (Wilson Dep. at 47–48) Officer Kittoe then told the plaintiff to leave for the second time. *Id.* at 48. In response, the plaintiff told Officer Kittoe that he would go into his house and get his business cards to identify himself as a lawyer. *Id.* Officer Kittoe gave plaintiff the final instruction to disperse when he walked over to the second squad car where Officer Smedley and the plaintiff were speaking. *Id.* at 58. In response, the plaintiff tried to reason with Officer Kittoe, telling him that he understood that Officer Kittoe "had a job to do," but that he did as well. *Id.* at 57–58. In response, Officer Kittoe arrested the plaintiff. *Id.* at 58.

Section 18.2–460A of the Virginia Code allows a police officer to arrest an individual for obstruction of justice if the individual "fails or refuses without just cause to cease such obstruction when requested to do so." The language of the statute only allows a police officer to arrest an individual for refusing to cease an "obstruction." Thus, the logic of the statute in punishing a refusal to comply is somewhat circular, as the arresting officer must still have probable cause to believe that an individual was obstructing justice in the first place in order to arrest the individual under the statute for refusing to comply. In other words, mere refusal to obey an officer, without more, is not a violation of the language of the statute.

This conclusion is supported by the Virginia Supreme Court's interpretation of the obstruction statute. The Supreme Court of Virginia has required actual interference with the officer, not just an inconvenience: "As the Supreme Court has held, and as the plain language of the statute states, obstruction of justice does not occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult but does not impede or prevent the officer from performing the task." *Ruckman v. Commonwealth*, 28 Va.App. at 429, 505 S.E.2d at 389 (1998). It might be inconvenient for a police officer to have a neighbor watch an arrest from his own property, but inconvenience cannot justify an arrest under the statute.

When protected speech is added to the equation in punishing an individual for refusing to comply with an order to disperse, the ability to punish under a general statute, such as an obstruction statute, becomes even more questionable. In *Hill*, the Court had to respond to Justice Powell's claim that the Court's decision would leave the city powerless to punish harmful situations involving protected speech. 482 U.S. at 463 n. 11, 107 S.Ct. at 2510 n. 11 As an example of the danger that the Court's decision posed, Justice Powell pointed to a hypothetical situation in which an individual might choose "to stand near a police

officer and persistently attempt to engage the officer in conversation while the officer is directing traffic at a busy intersection." *Id.* The Court did not share Justice Powell's prediction of a slippery slope, as cities could still punish the individual for failure to disperse, but only under "a properly tailored statute that makes it unlawful to fail to disperse in response to a valid police order." [9] *Id.* However, a city could not "attempt to punish such conduct by broadly criminalizing speech directed to an officer." *Id.*

The same distinction was made in the *Brooks* case, in which the court identified a more narrowly-tailored North Carolina statute that was not used in arresting the petitioner. 984 F.Supp. at 959. The court in *Brooks* chastised the decision to punish the failure to disperse under the more general obstruction statute, stating that "[b]ecause this statute has been broadly interpreted to cover certain forms of protected speech, it is impossible to determine whether Petitioner's conviction was based upon his actions-refusing to leave when so ordered—or his speech." *Id.* The North Carolina statute that should have been used prohibited the refusal to obey a police officer's order to disperse "if [the police officer] reasonably believes that a riot, or disorderly conduct by an assemblage of three or more persons, is occurring." *Id.* at 959. Thus, the statute punishes conduct in limited and specific instances that can be readily identified. Punishing an individual under such a statute would avoid the problem of having individual police officers exercising unqualified discretion in the gray area of constitutional speech.[10]

Allowing the state to punish an individual for refusal to obey or disperse under a general statute in a situation that is littered with potential for abuse of First Amendment rights gives the state a mask for unconstitutional conduct. In the present case, the "refusal to obey" argument may be a cover for Officer Kittoe's dislike of the plaintiff's criticism and comments, a conclusion that is not unreasonable given the facts of the case. The only order that Officer Kittoe gave which was not made in response to plaintiff's speech was given while the plaintiff was standing in his own driveway almost thirty feet away from the scene of the arrest. (Barbara Woolever Dep. at 24) The two other orders to leave the scene occurred in response to the plaintiff's conversations with Officers Kittoe and Smedley. (Wilson Dep. at 48, 58)

---

9. The distinction made by the Supreme Court between unconstitutional prohibition of speech through orders to disperse under general statutes and statutes narrowly tailored to punish the refusal to disperse allowed the Court's ruling to coexist with its decision in *Colten v. Kentucky,* in which the Court upheld a conviction under a statute that prohibited the refusal to comply with a lawful order of the police to disperse. 407 U.S. 104, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972).

10. The defense cites *Brown v. Gilmore,* 278 F.3d 362 (4th Cir.2002), for the proposition that an individual can be arrested under a general statute for refusing to obey an order. In *Brown,* the plaintiff was involved in a minor traffic accident, and she refused to move her car. The important distinction between *Brown* and the present case is that in *Brown* the act of leaving a car in the middle of the road satisfied the standard of disorderly conduct. As the court noted, "The situation itself suggested that Brown should move a car that had been blocking traffic for over half-an-hour on a major thoroughfare during Memorial Day weekend. An officer would be expected to request that the parties move their cars off the main road before the tempers of other motorists reached the boiling point." *Id.* at 368. The court in Brown was examining a situation in which the police were faced with a physical act and obstruction that threatened real harm. There is no question that a distinction exists between punishing verbal conduct and punishing physical conduct. *See Hill,* 482 U.S. 451, 107 S.Ct. 2502; *Brooks,* 984 F,Supp. 940; *Abrams v. Walker,* 165 F.Supp.2d 762, 764 (N.D.Ill.2001).

It was not until the plaintiff criticized Officer Kittoe that the officer felt compelled to arrest the plaintiff. *Id.* at 59.

Factually and legally, the mere refusal to obey an officer's order does not provide probable cause to arrest under the obstruction of justice statute. Such punishment may only be levied under a more narrowly-tailored statute.

## II.

### Clearly Established

 The Fourth Amendment right to be free from arrest in the absence of probable cause is clearly established. *See Henderson*, 223 F.3d at 273. But, "if the test of 'clearly established law' were to be applied at this level of generality, . . . plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability." *Gooden*, 954 F.2d at 968 (*quoting Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)); *see also Wilson v. Layne*, 526 U.S. 603, 615, 119 S.Ct. 1692, 1699–1700, 143 L.Ed.2d 818 (1999); *Henderson*, 223 F.3d at 273; *Pritchett*, 973 F.2d at 312; *Collinson*, 895 F.2d at 998. The appropriate question in this case is whether it is clearly established that a police officer may not arrest a third party for criticizing the officer's conduct and refusing to leave the scene of an arrest.

In determining whether this proposition is clearly established, the relevant inquiry is whether the arresting officer had notice that there were constitutional restrictions on his behavior. *See Henderson*, 223 F.3d at 273 ("Appellants must therefore allege facts demonstrating that the established contours of probable cause were sufficiently clear at the time of seizure such that the unlawfulness of [Appellees'] actions would have been apparent to reasonable offic[ials]." (alterations in original)); *Pinder*, 54 F.3d at 1173 ("The purpose of this doctrine is to ensure that police officers . . . have notice of the extent of constitutional restrictions on their behavior."). The search for notice helps to ensure that police officer have crossed a "bright line," separating constitutional from unconstitutional conduct. *See Doe v. Broderick*, 225 F.3d 440, 453 (4th Cir.2000); *Gooden*, 954 F.2d at 968.

A "smoking gun" under the second prong of the qualified immunity test would be a case that is on all fours with the present factual situation. It is rare to find such a case, but in the present dispute it appears that two such cases exist. The *Brooks* case, discussed previously, is almost identical in terms of the relevant facts to the present situation. A third party, standing on his own property, was unlawfully arrested under an obstruction of justice statute for having protested the police treatment of a young boy during an arrest. 984 F.Supp. 940 As in the present case, the petitioner in *Brooks* refused to obey a police order to disperse. *Id.* About the only factual similarity lacking is employment: Brooks was a minister, plaintiff is a lawyer.

That factual deficiency is corrected in *Abrams v. Walker*, an Illinois case in which the plaintiff, an attorney, was following his client, Forte, on the highway after a courthouse appearance when the police stopped the client for alleged traffic offenses. 165 F.Supp.2d 762, 764 (N.D.Ill. 2001). Abrams stopped his car and backed it up to where his client and the police officer were stopped. *Id.* Abrams identified himself as Forte's attorney and asked the police officer why he had stopped Forte. *Id.* Abrams then started to ask the police officer questions "in an argumentative tone." *Id.* The court held that Abrams' opinions and concerns about his client's traffic stop do not by themselves constitute probable cause to arrest.

*Id.* at 767–68. However, when Abrams refused to present identification, returned to his car, and grabbed a knife, then there was sufficient probable cause to arrest for obstruction of justice. *Id.* at 767.

The *Brooks* and *Abrams* cases are helpful in proving the lack of probable cause to arrest in closely analogous situations. However, courts are not limited under the "clearly established" prong to a search for identical precedent. Instead, a court can look for clearly established rights which are "manifestly included within more general applications of the core constitutional principle involved." *Pritchett,* 973 F.2d at 314; *see also Wilson v. Layne,* 526 U.S. at 615, 119 S.Ct. at 1699; *Pinder,* 54 F.3d at 1173 ("It is important not to be over-specific—there need not be a prior case directly on all fours with the facts presented to the official."). In fact, the absence of a case specifically on point could actually be used to prove the existence of a clearly established right, as "the absence of [many] reported case[s] with similar facts demonstrates nothing more than widespread compliance with well-recognized constitutional principles." *Buonocore v. Harris,* 65 F.3d 347, 357 (4th Cir.1995) (*quoting Eberhardt v. O'Malley,* 17 F.3d 1023, 1028 (7th Cir.1994) (alterations in original)).

In the present case, the more general principle involved would be the right clarified in *Hill* and expounded upon in later cases that individuals are free to peacefully criticize police officers without fear of being silenced under a general obstruction or disorderly conduct statute. This right existed in the common law almost one hundred and sixty years prior to the decision in *Hill. See Hill,* 482 U.S. at 463 n. 12, 107 S.Ct. at 2510 n. 12 ( *citing Levy v. Edwards,* 1 Car. & P. 40, 171 Eng.Rep. 1094 (Nisi Prius 1823) ("where constable breaks up fight between two boys and proceeds to handcuff one of them, third party who objects by telling constable 'you have no right to handcuff the boy' has done no wrong and may not be arrested."); *The King v. Cook,* 11 Can.Crim.Cas.Ann. 32, 33 (B.C. County Ct.1906) ("Cook … a troublesome, talkative individual, who evidently regards the police with disfavour and makes no secret of his opinions on the subject … [told] some persons in a tone of voice undoubtedly intended for [the officer's] ears, that the arrested man was not drunk and the arrest was unjustifiable. Now up to this point he had committed no crime, as in a free country like this citizens are entitled to express their opinions without thereby rendering themselves liable to arrest unless they are inciting others to break the law; and policemen are not exempt from criticism any more than Cabinet Ministers."); *Ruthenbeck v. First Criminal Judicial Dist. Court of Bergen Cty.,* 7 N.J.Misc. 969, 147 A. 625 (1929) ("vacating conviction for saying to police officer 'You big muttonhead, do you think you are a czar around here?' ")).

The ability to peacefully criticize the police set forth in *Hill* as a right of a free society has been recognized in Virginia. *See Marttila,* 33 Va.App. at 602, 535 S.E.2d at 698 (quoting *Hill* in overturning the arrest of an individual who cursed angrily at the police); *Ford,* 23 Va.App. at 143, 474 S.E.2d at 850–51 (quoting *Hill* for the proposition that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."). In addition, at least one Virginia court has recognized the clearly established principle that police officers are expected to exercise greater restraint in the face of obscene gestures or words, thereby stretching the logic of *Hill* to protect a wider amount of criticism:

"The U.S. Court of Appeals for the Second, Eighth, and Ninth Circuits have applied *Hill* to hold that the 'fighting words' doctrine may be limited in the

case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen."

*Marttila,* 33 Va.App. at 601, 535 S.E.2d at 697 ( *quoting Buffkins v. City of Omaha,* 922 F.2d 465, 472 (8th Cir.1990); *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 415–16 (2nd Cir.1999); *Duran v. City of Douglas, Arizona,* 904 F.2d 1372, 1377 (9th Cir.1990) ("No less well established is the principle that government officials in general, police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity.")).

Looking at the case law of the Fourth Circuit, there appear to be few, if any, qualified immunity cases in which a general constitutional principle as applied to a specific situation has been so well established as the right to peacefully criticize a police officer without fear of arrest for obstruction of justice.[11] The refusal to obey an officer's order under the statute does not make the right any less clear, as the statute still requires the existence of probable cause of obstruction in order to arrest for a refusal to obey an order to disperse. In addition, cases such as *Hill* and *Brooks* show that it is clearly established that the refusal to obey an order without more cannot be used as a cover for suppressing protected speech under a general, broad statute. *See Hill,* 482 U.S. at 463 n. 11, 107 S.Ct. at 2510 n. 11; *Brooks,* 984 F.Supp. at 959.

## III.

### Reasonableness of Officer Kittoe's Conduct

■ The remaining question for qualified immunity purposes is whether a reasonable person in the officer's position would have known that doing what he did would violate the plaintiff's clearly held right. *See Henderson,* 223 F.3d at 271; *Pritchett,* 973 F.2d at 312; *Collinson,* 895 F.2d at 998. Whether the reasonableness inquiry is undertaken within the search for the violation of a clearly established right, *see, e.g., Rogers v. Pendleton,* 249 F.3d 279, or as a separate inquiry, the Fourth Circuit has noted the existence of mixed questions of law and fact in this prong of the test. *See Pritchett,* 973 F.2d at 312 ("The third, which involves application of *Harlow*'s objective test to that particular conduct at issue, may require factual determinations respecting disputed aspects of that conduct."); *Collinson,* 895 F.2d at 998. The existence of material factual disputes as to the reasonableness of an official's conduct would defeat summary judgment. *See Buonocore,* 65 F.3d at 359–60; *Pritchett,* 973 F.2d at 313; *Collinson,* 895 F.2d at 1001 ("Questions of subjective states of mind are of course notoriously ill-adapted to summary resolution.").

11. The one Fourth Circuit case that might, on a cursory examination, be read to cast doubt on the clearly established nature of the right is *Smith v. Tolley,* 960 F.Supp. 977 (1997), in which an arrest for obstruction of justice was upheld on the basis of qualified immunity. While it is true that the plaintiff in *Smith* was criticizing the police officer, his physical actions were the key to the court's decision. *See Smith* at 996 ("In the present action, ... the Court finds that a reasonably competent police officer could have concluded that Smith knowingly tried to prevent a law enforcement officer from serving an objectively valid arrest warrant by his obstreperous behavior, his obstinate refusal to answer [the officer's] questions, his videotaping of the events, and his shutting the door in [the officer's] face."). The physical act of slamming a door in a police officer's face to prevent a valid warrant from being served obviously constitutes direct action to knowingly impede the officer himself. Such direct action is lacking in the present case.

This prong of the qualified immunity analysis allows the court the opportunity to judge the violation of the right "in light of the exigencies of time and circumstance in which the official took the action challenged." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991). In judging the actions of a police officer, the objective standard that must be used is that of a reasonable police officer. *See Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir.1991); *Amato v. City of Richmond*, 875 F.Supp. 1124, 1142 (E.D.Va.1994).

In looking at the "exigencies of time and circumstance," the defense would have the Court hold that the "tense situation" on the morning of April 14, 1999 excuses the violation of a clearly established right, as a reasonable police officer would have arrested the plaintiff. This claim is belied by the evidence, at least for purposes of summary judgment, when the facts are viewed in the light most favorable to the non-moving party.

Plaintiff came onto the scene of the arrest around three o'clock in the morning on April 14, 1999. (Wilson Aff. at 1) Being three o'clock in the morning, the area was very dark. However, before leaving his house, the plaintiff turned on his porch light and the garage light. (Wilson Dep. at 56) When he left the house, the plaintiff did not proceed directly to the scene of the arrest. Instead, he stood on his own property about thirty feet away from the arrest. (Barbara Woolever Dep. at 24) Throughout the course of the events, the plaintiff never approached the scene of the arrest. In addition, the plaintiff readily identified himself when asked and even offered to produce evidence to prove that he was a lawyer. (Wilson Dep. at 48)

Officer Kittoe's actions toward the plaintiff also do not show the actions of an officer who is afraid for his safety. When Officer Kittoe first noticed the presence of the plaintiff, he did not immediately arrest the plaintiff or assume a defensive posture. Instead, he asked the plaintiff if he had called in the complaint and then told the plaintiff that he was "interfering with the investigation." *Id.* at 47. Officer Kittoe did not arrest the plaintiff until the plaintiff had criticized Officer Kittoe's investigation. *Id.* at 59. The arrest of the plaintiff came at a time when there was police backup on the scene, and Woolever had already been placed in handcuffs. (Wilson Aff. at 2)

The Court is extremely reluctant to put itself in the shoes of a reasonable officer, but it is aided by the presence on the scene of Officer Smedley, Officer Kittoe's fellow officer. Unlike Officer Kittoe, Officer Smedley was actually approached by the plaintiff. (Wilson Dep. at 57) Officer Smedley was not made uneasy by the presence of the plaintiff. He merely referred the plaintiff's questions to Officer Kittoe. *Id.* at 58.

The purpose of this analysis is not to say that Officer Kittoe's fears were completely without basis. However, there does exist a question of material fact as to the reasonableness of the arrest. *See Duran v. City of Douglas, Arizona*, 904 F.2d at 1378 ("There remains a material issue of fact, therefore whether [the officer] intended to hassle Duran as punishment for exercising his First Amendment rights."). A jury of Officer Kittoe's peers is much more capable of judging the reasonableness of Officer Kittoe's actions that morning than this Court. As the Court has already decided those questions wholly reserved for it, namely the alleged violation of a clearly established right, the remaining factual disputes should be reserved for a jury.

## IV.

### The Role of Lieutenant Tokach

Even if the application of qualified immunity in Officer Kittoe's case is inap-

propriate, the defense argues that Lieutenant Tokach was not directly involved in the decision to arrest and should be dismissed from the suit. (Mot. for Summ. J. at 15) The plaintiff believes that Lieutenant Tokach was involved in the arrest based on several assumptions drawn from the following facts. After the plaintiff had been placed in handcuffs, he saw Lieutenant Tokach appear on the scene and begin to talk to Officer Kittoe. (Wilson Dep. at 60) The plaintiff saw Lieutenant Tokach, during the conversation with Officer Kittoe, look in the plaintiff's direction and nod affirmatively. (Wilson Dep. at 62). Lieutenant Tokach also spoke to Officer Smedley on the scene. (Wilson Dep. at 60)

It is a clearly established principle that Officer Tokach could be liable in a § 1983 action as a supervising officer for the unconstitutional conduct of his subordinates. *See Randall v. Prince George's County,* 302 F.3d 188, 203 (4th Cir.2002) ("If a supervisory law officer is deliberately indifferent . . . he then bears some culpability for illegal conduct by his subordinates, and he may be held vicariously liable for their illegal acts."); *Shaw v. Stroud,* 13 F.3d 791, 798 (1994) ("The principle is firmly entrenched that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."); *Slakan v. Porter,* 737 F.2d 368, 372 (4th Cir.1984) ("The decisions of this court have firmly established the principle that supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.").

█ The test for supervisory liability requires three elements to be proven: (1) The supervisor had actual or constructive knowledge that his subordinate's conduct posed a pervasive and unreasonable risk of constitutional injury; (2) the supervisor's response was so inadequate as to show deliberate indifference or tacit authoriza-

tion; and (3) there is a causal link between the inaction and the constitutional injury. *See Shaw,* 13 F.3d at 799. The relevant question is what Lieutenant Tokach knew about the circumstances surrounding the violation of the plaintiff's clearly established rights and whether his response amounted to deliberate indifference.

In the present case, no evidence has been put forward by the plaintiff tending to prove that Lieutenant Tokach had actual or constructive knowledge of the circumstances of the plaintiff's arrest. A very high level of proof has been required in supervisor liability cases. *See Randall,* 302 F.3d at 207 ("Because supervisors . . . may be powerless to prevent deliberate unlawful acts by subordinates, the courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach."); *Shaw,* 13 F.3d at 800–01. This high level of proof cannot be satisfied at the summary judgment stage by the plaintiff's mere allegations. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Lieutenant Tokach arrived on the scene after Officer Kittoe had already concluded the arrest of the plaintiff. (Wilson Dep. at 60) Lieutenant Tokach made no affirmative decision concerning the arrest, and he was not the arresting or charging officer. (Tokach Dep. at 16–17). The plaintiff admits that he can only "assume" that Lieutenant Tokach participated in his arrest. (Wilson Dep. at 61) The only reasonable inference that can be drawn from the plaintiff's evidence is that Lieutenant Tokach spoke to both Officer Kittoe and Officer Smedley. This, without more, is not evidence of Lieutenant Tokach's deliberate indifference.

This conclusion is bolstered by the doctrine of qualified immunity. A reasonable

lieutenant in Lieutenant Tokach's position on the scene would defer to his officers' explanation of what had transpired. While a reasonable lieutenant could not defer if he knew that the officers had violated the clearly established rights of the plaintiff, there is no evidence that Officer Kittoe told Lieutenant Tokach about the events leading up to the plaintiff's arrest. In fact, the plaintiff admits in his deposition that Officer Kittoe only spoke to Lieutenant Tokach for "a moment or two." (Wilson Dep. at 60). This short time frame would not provide the opportunity for a long discussion about the arrest. Officer Kittoe might have had time to explain that the plaintiff had committed an obstruction of justice, but the facts do not support an inference that Officer Kittoe described the entire episode truthfully and objectively. Thus, no reasonable inference can be made that Lieutenant Tokach knew that the arrest of the plaintiff was motivated by the plaintiff's protected speech.[12]

Even if Lieutenant Tokach had no actual knowledge of the events leading up to the plaintiff's arrest, the plaintiff argues that the lieutenant had a duty to discover the full story behind the arrest. If this were true, then any time a subordinate officer's arrest violated constitutional rights a superior officer could be held liable for failing to investigate the circumstances surrounding the arrest. Such a burdensome duty to investigate is not clearly established. It is only established in the law that a supervisor cannot be deliberately indifferent to the violation of an individual's rights. *See Randall,* 302 F.3d 188; *Shaw,* 13 F.3d 791; *Slakan v. Porter,* 737 F.2d 368. Deliberate indifference is a far cry from an affir-

mative duty to investigate the circumstances surrounding an arrest.

Because there is no evidence beyond mere allegations which support Lieutenant Tokach's knowledge of the circumstances leading to the arrest of the plaintiff, the Motion for Summary Judgment as to Lieutenant Tokach is granted, and he is dismissed from the case.

### Conclusion

There is always the chance that any action which casts the shadow of liability on a government official may chill police action. However, the aggressiveness of government officials in pursuing otherwise legitimate aims may not be used as an excuse to encroach on clearly held constitutional rights. The doctrine of qualified immunity is a balance. It is not a carte blanche for government officials to intrude on established constitutional rights.

Accordingly, the Motion for Summary Judgment on the grounds of qualified immunity is denied as to Officer Kittoe, but granted as to Lieutenant Tokach.

---

**12.** In the qualified immunity analysis of Lieutenant Tokach's actions, it is important to remember that Lieutenant Tokach was not on the scene when the arrest took place. He was therefore completely reliant on the representations of his officers. To believe that Lieutenant Tokach's actions were unreasonable, one would have to assume that Officer Kittoe not only told Lieutenant Tokach the entire story but also told him the complete truth about the events leading up to the arrest. There is no evidence to support this highly doubtful conversation.